222 P.2d 624

**BEGAY v. MILLER, Sheriff.**

No. 5387.

Supreme Court of Arizona

Oct. 2, 1950.

Rawlins, Davis, Christy, Kleinman & Burrus, of Phoenix, for petitioner.

Platt & Greer, of St. Johns, for respondent.

H. S. McCluskey, Phoenix, for Industrial Commission, amicus curiæ.

UDALL, Justice.

Petitioner, Roland Begay, a Navajo Indian, is seeking by habeas corpus his release from incarceration in the Apache County jail to which he was committed after having been found guilty of contempt of the superior court of that county for failure to comply with the terms of a divorce decree. Presented is a question of first impression not only in this court but insofar as we have been able to determine in any appellate court in the United States.

The facts are that the petitioner and Alice R. Begay obtained a marriage license under the provisions of Sec. 63-106, A.C.A. 1939, signed by the clerk of the Superior Court of Apache County, Arizona, and were married on the reservation in a civil ceremony. Both of the contracting parties are non-emancipated members of the Navajo Indian Tribe and at all times were residing upon that portion of the Navajo Reservation lying within the confines of Apache County.

Marital troubles having developed, Roland Begay, the petitioner, filed a divorce complaint against his wife in the Navajo Court of Indian Offenses, a tribal court. A hearing was held, both parties being before the court, and a formal written decree of divorce was granted to the petitioner. The decree recited that there were no children involved in the case. Thereafter, Alice R. Begay, as plaintiff, filed suit for divorce against Roland Begay in the Superior Court of Apache County. Summons was issued and served upon him on the Indian reservation. He failed to answer and a purported judgment and decree of divorce was rendered in favor of the plaintiff and against the petitioner as defendant.

This decree allowed alimony to the wife and support money for the maintenance of

a minor child born subsequent to the date of the tribal divorce, together with costs and counsel fees. Inasmuch as the petitioner made no payments under this decree, some sixteen months later the plaintiff filed her affidavit charging contempt of court. An order to show cause was issued, in response to which the petitioner filed a motion to quash upon practically the same grounds as now urged for his release upon habeas corpus. After a hearing, the court filed a written opinion and order denying the motion to quash and finding that Roland Begay was guilty of contempt of court for failure to abide by the terms of the decree of divorce theretofore entered. It was judicially established that he was in arrears on his payments in the sum of $1175, which amount he was ordered to pay forthwith. Thereafter, a warrant and commitment for contempt was issued against petitioner and he was taken into custody on the reservation by the sheriff of Apache County and incarcerated in the county jail.

Petitioner then made application to this court for a writ of habeas corpus, which was granted. Upon the return date the sheriff produced the body of the petitioner in court and made answer and return to the writ. At the conclusion of oral argument, upon the assurance of the chairman of the Navajo Tribal Council that the petitioner would, if not discharged, be surrendered to the sheriff without cost to the county, we released the petitioner on his own recognizance.

A ruling was reserved at that time on respondent's motion to quash which was based upon petitioner's failure to comply with the rules of court. This inconsequential motion is now denied in order that we may determine on their merits the serious matters raised by the petition.

Basically, the legal question presented is one of jurisdiction, i. e. did the Apache County Superior Court, under the circumstances here shown, have jurisdiction to enter the decree of divorce in question? Secondarily, there is raised the right of a peace officer of the state to enter upon an Indian reservation for the purpose of serving a legal process in any matter wherein the parties are both tribal Indians residing on the reservation and the subject matter of the suit deals only with the controversy between themselves.

It is the contention of the petitioner that the marriage in question was effectually dissolved by the Navajo Court of Indian Offenses and that the Superior Court of Apache County was bound to accord recognition to such decree, and hence the state court lacked jurisdiction to grant the subsequent decree of divorce to Alice Begay and to issue the order for contempt under which the petitioner was incarcerated. Two claims are advanced in support of this contention. Primarily, it is argued that the Navajos are treaty Indians inherently possessing a limited right of self-government, which has not been delegated away either by express grant or by agreement with the

federal government or with an individual state. Secondly, it is asserted that Congress through powers delegated to the Interior Department has given the tribal court jurisdiction over domestic relations between members of the Navajo tribe. The fact that these two claims are inconsistent is of no moment for if the tribal court had jurisdiction from any source and properly exercised its jurisdiction over the marital status of petitioner, then such action was final and binding on the parties.

Counsel for the respondent on the other hand not only directly challenge both contentions of the petitioner but assert that the Navajo Court of Indian Offenses is nothing more than the product of a mere administrative fiat, set up by and subject to the caprice of the Indian Bureau, and that such a court cannot be recognized under either the rules of comity or the "Full Faith and Credit clause" of the Federal Constitution, Article 4, § 1. Furthermore, it is contended that where the Congress by express enactment has declared all Indians citizens of the United States of America, 43 Stat. 253, Title 8 U.S.C.A. §§ 3 and 601 note, it would deprive Alice Begay, wife of petitioner, of her rights under the equal protection clause of the 14th Amendment to the United States Constitution to hold that she could not go into the superior court and have her marital rights settled in that judicial tribunal. Last, respondent maintains that when petitioner and wife applied to the civil authorities for a state marriage license and were married pursuant thereto in a civil ceremony, that these parties acknowledged state jurisdiction over their marital status and any severance of the marital relationship must necessarily be in accordance with and under the sanctity and authority of the state.

At the outset it is well to recognize that the pathways are not well marked in the field of Indian law generally and particularly is this true in the field of domestic relations of tribal Indians. This lack of uniformity is understandable when one considers the varying customs and laws relative to marriage and divorce prevailing amongst the several tribes in the continental United States. Coupled with this are many special treaties and particular tribal constitutions adopted by sanction of congressional enactments, which are factors contributing to the diversity. For an authoritative discussion of these matters, see Felix S. Cohen, Handbook of Federal Indian Law, Sec. 5, Tribal Regulation of Domestic Relations, p. 137. For reasons stated we feel there is no point to be gained by attempting to analyze the many reported decisions, however, we recognize that there is a distinction between such cases as Worcester v. State of Georgia, 6 Pet. 515, 8 L.Ed. 483; Cyr v. Walker, 29 Okl. 281, 116 P. 931, 35 L.R.A.,N.S., 795; and Raymond v. Raymond, 8 Cir., 1897, 83 F. 721, involving suits affecting the Cherokee and Pottawatomie tribes where there was an express treaty provision recognizing them

384

as independent nations and giving the courts of the tribal territory exclusive jurisdiction over members of these tribes, and the instant situation where there is no such treaty provision.

All writers on the subject are agreed that the legal relationship existing between the United States Government, state governments and tribal Indians within their jurisdiction is difficult of precise description. Furthermore, all are in accord that such relationship is a peculiar and anomalous one. See 13 Yale Law Journal, p. 250 et seq. Except for a few tribes, tribal Indians are still regarded by the federal government as requiring special consideration and protection. Harrison v. Laveen, 67 Ariz. 337, 196 P.2d 456. Even though the Indians have been granted the rights of citizenship, the Federal Courts have consistently held that the congressional power over tribal Indians was not diminished thereby. United States v. Waller, 243 U.S. 452, 37 S.Ct. 430, 61 L.Ed. 843. See also 19 Cal.Law Review 513.

■ Indian tribal custom marriage and divorce have long been recognized by both the federal and state governments. 17 Am. Jur., Divorce and Separation, Sec. 11; 55 C.J.S., Marriage, § 4c; Moore v. Wa-Me-Go, 72 Kan. 169, 83 P. 400; Kobogum v. Jackson Iron Co., 76 Mich. 498, 43 N.W. 602; La Framboise v. Day, 136 Minn. 239, 161 N.W. 529, L.R.A.1917D, 571; Johnson v. Johnson's Adm'r, 30 Mo. 72, 77 Am.Dec. 598; Ortley v. Ross, 78 Neb. 339, 110 N.W. 982; Buck v. Branson, 34 Okl. 807, 127 P. 436, 50 L.R.A., N.S., 876; Jones v. Laney, 2 Tex. 342. The basis of such recognition is the fact that the Indians, prior to the adoption of either the federal or state constitutions, exercised sole control of domestic relations among their own peoples. Thus, jurisdiction of the Navajo Indians over their marriage and divorce has continued as it existed before the Indians were removed to the reservation by virtue of treaty, 9 Stat. 974 and 15 Stat. 667. Nowhere is this concept expressed more clearly than in the early case of Wall v. Williamson, 1844, 8 Ala. 48, where the Alabama Court, in recognizing the validity of tribal custom marriages and divorces among the Choctaw tribe, stated: " * * * Waiving the consideration of the peculiar relation which these Indian tribes bear to the States, within the limits of which they were resident, and assuming that the individuals composing the tribes could, by the States, have been made subject to their general laws, the question yet remains, whether, at the time of this supposed marriage, the laws and usages of the Choctaw tribe had been abolished or superseded; or, whether they composed a distinct community, governed by their own chiefs and laws. It is not pretended, that any statute producing this effect was then passed, and therefore, if lost at all, their local laws must have been lost, in consequence of their living within the territorial limits of the States. It may

be difficult to ascertain the precise period of time when one nation, or tribe, is swallowed up by another, or ceases to exist; but until then, there can not be said to be a merger. It is only by positive enactments, even in the case of conquered and subdued nations, that their laws are changed by the conqueror. The mere acquisition, whether by treaty or war, produces no such effect. * * *"

In the Handbook of Federal Indian Law, Ch. 7, p. 122, it is said: "From the earliest years of the Republic the Indian tribes have been recognized as 'distinct, independent, political communities,' and, as such, qualified to exercise powers of self-government, not by virtue of any delegation of powers from the Federal Government, but rather by reason of their original tribal sovereignty. * * *" citing Worcester v. Georgia, supra. And on page 123 of the same text is the following statement: "The whole course of judicial decision on the nature of Indian tribal powers is marked by adherence to three fundamental principles; (1) An Indian tribe possesses, in the first instance, all the powers of any sovereign state. (2) Conquest renders the tribe subject to the legislative power of the United States and, in substance, terminates the external powers of sovereignty of the tribe, e. g., its power to enter into treaties with foreign nations, but does not by itself affect the internal sovereignty of the tribe, i. e., its powers of local self-government. (3) These powers are subject to qualification by treaties and by express legislation of Congress, but, save as thus expressly qualified, full powers of internal sovereignty are vested in the Indian tribes and in their duly constituted organs of government."

In the case of the Navajo Indians neither the United States Government nor the State of Arizona, assuming the latter could do so, has attempted to regulate or control their domestic affairs. Indicative of the view of the President and the Congress as to these matters is the recent action taken in connection with the Navajo-Hopi Rehabilitation Act. The original measure, S. No. 1407, was vetoed by the President on October 17, 1949, with this statement: "* * * its only objectional provisions are those of section 9 which, with some qualifications, *extend State civil and criminal laws and court* jurisdiction to the Navajo-Hopi Reservations *which are now under Federal and tribal laws and courts."* (Emphasis supplied.)

The present Act, Chapter 92, Public Laws, 474, U. S. Code Congressional Service, 1950, No. 3, page 414, 25 U.S.C.A. § 631 et seq., shows that the bill eliminates all of the provisions of section 9, which refer to the applicability of state civil and criminal laws and court jurisdiction on the Navajo-Hopi Reservations.

The only official action of any kind in regard to the domestic relations of the Navajos is that taken by the Commissioner

of Indian Affairs under R.S. § 463, 25 U.S.C.A. § 2. Pursuant to that authority the Bureau of Indian Affairs, Department of the Interior, established certain rules and regulations for the enforcement of law and order on Indian Reservations. 25 C. F.R. 161. The Tribal Council was given the opportunity to determine whether Indian custom marriage and divorce for members of the tribe should continue to be recognized in the future as lawful marriage and divorce upon the reservation, to determine what would constitute such marriage and divorce, and whether action by the Court of Indian Offenses was to be required. 25 C.F.R. 161.28. It should be noted that affirmative action by the tribal council was not required by the regulations. In the absence of such determination by the Tribal Council, the validity of Indian custom marriage and divorce was to be recognized as before. 25 C.F.R. 161.28(b). The council was simply given the right to come voluntarily under regulations, the purpose of which obviously was to give custom marriages and divorces a certain formality which had been lacking in some cases prior thereto. The Navajo Tribal Council, exercising their own right of self-determination as to domestic affairs, chose to take advantage of the regulations, and in July, 1944 met and determined what constituted Indian custom divorce, provided what procedure was to be followed, and decided that the Court of Indian Offenses was to have jurisdiction of same. It was

under such jurisdiction and pursuant to that procedure that petitioner in the instant case procured his divorce. The foregoing discussion dispenses with the second contention that the jurisdiction of the Court of Indian Offenses was granted by the United States Government. It is our view that the Court of Indian Offenses, when sitting as a court in divorce matters, is not a federal court under Art. 3, Sec. 1, of the Federal Constitution, but is simply a tribal court exercising jurisdiction retained by the Indians over their own domestic relations problems. United States v. Clapox, D.C., 1888, 35 F. 575. If this tribal court were in truth and in fact a federal court, then clearly it would not have jurisdiction to grant divorces or annul marriages. The states normally have exclusive jurisdiction in the field of domestic relations. McCarty v. Hollis, 10 Cir., 1941, 120 F.2d 540; Barber v. Barber, 21 How. 582, 16 L.Ed. 226.

So far as the Federal government is concerned, the validity of such divorces is conceded and we see no constitutional basis for the courts of Arizona refusing to recognize the validity of such decrees. Such recognition obviously is not made under the "full Faith and Credit" clause of Art. 4, Sec. 1, of the Constitution of the United States, for clearly this clause applies only between states of the Union. Neither is it done under the commonly accepted meaning of the term "comity," which presupposes two independent sovereign nations, because the Navajo tribe is not now

classed as such, but we recognize it because of the general rule, call it by whatever name you will, that a divorce valid by the law where it is granted is recognized as valid everywhere. The fact that a formal decree is now entered by a tribal court does not vary in any way the recognition theretofore accorded in this anomalous situation.

■ We next consider respondent's contention that to deny Alice Begay the opportunity to go into superior court and have her marriage dissolved is to deny her equal protection of the laws as guaranteed by the 14th Amendment to the Federal Constitution. It is fundamental that: "Constitutional guaranties of equal rights and privileges are for the benefit of only those persons whose rights are affected and cannot be taken advantage of by any other person." 11 Am.Jur., Constitutional Law, Sec. 113.

■ Even if we were to assume that the argument as to equal protection of the laws could be properly raised in this collateral attack by habeas corpus, still there has been no infringement on the rights of Sheriff Miller, the respondent. He cannot rely on theoretical inequalities when he is not affected by the discrimination which he asserts exists.

■ We have carefully considered respondent's contention that a marriage between two tribal Indians in a civil ceremony on the reservation under authority of a license issued by the state can be dissolved only by a state court. Counsel has cited us no authority nor have we been able to find any supporting the proposition that these parties, by applying for a state license, submitted themselves to and acknowledged exclusive state jurisdiction over their marital status. Indeed, the only authority concerning this matter we have found states: "The fact that Indians may obtain marriage licenses from state officials does not deprive the tribe of jurisdiction to issue a divorce where the parties are properly before tribal court. In this respect Indians are in the same position as persons who, after marrying under the law of one state, may be divorced under the law of another state or of a foreign nation." Handbook of Federal Indian Law, Sec. 5, p. 138.

We, likewise, can see no difference in principle or reason, since both parties in the instant case were properly before the tribal court.

As a matter of fact, to rule otherwise would not be in accord with the public policy of either the Federal Government or of our own state government, both of which are attempting to assimilate the Indians into our society. The immediate effect would be to throw prematurely the marital difficulties of all tribal Indians into the superior courts of the state. That Arizona is attempting to encourage the Indians to marry under authority of the

state is clearly indicated by Sec. 63-106, ACA 1939, empowering Indian superintendents to issue licenses signed by the clerk of the superior court. Harrison v. Laveen, supra. We refuse to cast the shadow of bigamy across the marriage of those Indians, who have previously been married by virtue of a state license and divorced according to Indian custom and then remarried.

The learned judge of the superior court trying the divorce case of Begay v. Begay erroneously considered the controlling question to be whether the United States had retained exclusive jurisdiction of the Navajo Indian Reservation. See Art. I, Sec. 8, Cl. 17, U. S. Constitution. That court in assuming jurisdiction and granting the divorce relied upon the case of Arledge v. Mabry, 52 N.M. 303, 197 P.2d 884, involving an election matter, which points out the distinction between the exclusive jurisdiction acquired by the federal government on the Los Alamos atomic project under consideration in that case, or on other similar Federal enclaves, and the proprietary control retained on an Indian reservation. In discussing the requirements as to residence for voting purposes in Arizona, we made it clear in the case of Porter v. Hall, 34 Ariz. 308, 271 P. 411, and in the more recent case of Harrison v. Laveen, supra [67 Ariz. 337, 196 P.2d 458], that members of Indian tribes residing on Indian reserva-

tions situated within the physical boundaries of the state were residents of the State within which they lived. Furthermore, in the latter case we held: " * * * that Indian reservations in Arizona are within political and governmental boundaries of the state, and limitations on state's jurisdiction in Enabling Act apply only to Indian lands considered as property, but do not withdraw territorial area from sovereignty of state and control of its laws."

However, a different problem is here presented as we are considering for the first time jurisdiction of a tribal court in the field of Indian domestic relations.

We hold that the Superior Court of Apache County was without jurisdiction to enter the decree of divorce attacked in the instant case, the decree of the tribal court being conclusive, hence the order holding petitioner in contempt of its decree was a nullity, which entitles the petitioner to his discharge on habeas corpus. This conclusion makes it unnecessary to consider the second assignment relative to service on the reservation of a legal process by an officer of the state.

Petitioner discharged.

LA PRADE, C. J., and STANFORD, PHELPS, and DE CONCINI, JJ., concur.