## WILLIAMS ET UX. *v.* LEE, DOING BUSINESS AS GANADO TRADING POST.

No. 39. Argued November 20, 1958.—Decided January 12, 1959.

*Norman M. Littell* argued the cause for petitioners. With him on the brief was *Frederick Bernays Wiener.*

*Wm. W. Stevenson* argued the cause for respondent. With him on the brief was *W. Dean Nutting.*

*Solicitor General Rankin, Assistant Attorney General Morton* and *Roger P. Marquis* filed a brief for the United States, as *amicus curiae,* at the invitation of the Court, 356 U. S. 930, urging reversal.

MR. JUSTICE BLACK delivered the opinion of the Court.

Respondent, who is not an Indian, operates a general store in Arizona on the Navajo Indian Reservation under a license required by federal statute.[1]  He brought this

_____

[1] 31 Stat. 1066, as amended, 32 Stat. 1009, 25 U. S. C. § 262, provides: "Any person desiring to trade with the Indians on any Indian reservation shall, upon establishing the fact, to the satisfaction

action in the Superior Court of Arizona against petitioners, a Navajo Indian and his wife who live on the Reservation, to collect for goods sold them there on credit. Over petitioners' motion to dismiss on the ground that jurisdiction lay in the tribal court rather than in the state court, judgment was entered in favor of respondent. The Supreme Court of Arizona affirmed, holding that since no Act of Congress expressly forbids their doing so Arizona courts are free to exercise jurisdiction over civil suits by non-Indians against Indians though the action arises on an Indian reservation. 83 Ariz. 241, 319 P. 2d 998. Because this was a doubtful determination of the important question of state power over Indian affairs, we granted certiorari. 356 U. S. 930.

Originally the Indian tribes were separate nations within what is now the United States. Through conquest and treaties they were induced to give up complete independence and the right to go to war in exchange for federal protection, aid, and grants of land. When the lands granted lay within States these governments sometimes sought to impose their laws and courts on the Indians. Around 1830 the Georgia Legislature extended its laws to the Cherokee Reservation despite federal treaties with the Indians which set aside this land for them.[2] The Georgia statutes forbade the Cherokees from enacting laws or holding courts and prohibited outsiders from being on the Reservation except with permission of the State Governor. The constitutionality of these laws was tested in *Worcester* v. *Georgia*, 6 Pet. 515, when the State sought to punish

of the Commissioner of Indian Affairs, that he is a proper person to engage in such trade, be permitted to do so under such rules and regulations as the Commissioner of Indian Affairs may prescribe for the protection of said Indians."

[2] The Georgia laws are set out extensively in *Worcester* v. *Georgia*, 6 Pet. 515, 521–528. The principal treaties involved are found at 7 Stat. 18, 39.

a white man, licensed by the Federal Government to practice as a missionary among the Cherokees, for his refusal to leave the Reservation. Rendering one of his most courageous and eloquent opinions, Chief Justice Marshall held that Georgia's assertion of power was invalid. "The Cherokee nation . . . is a distinct community, occupying its own territory . . . in which the laws of Georgia can have no force, and which the citizens of Georgia have no right to enter, but with the assent of the Cherokees themselves, or in conformity with treaties, and with the acts of congress. The whole intercourse between the United States and this nation, is, by our constitution and laws, vested in the government of the United States." 6 Pet., at 561.

Despite bitter criticism and the defiance of Georgia which refused to obey this Court's mandate in *Worcester* [3] the broad principles of that decision came to be accepted as law. [4] Over the years this Court has modified these principles in cases where essential tribal relations were not involved and where the rights of Indians would not be jeopardized, but the basic policy of *Worcester* has remained. Thus, suits by Indians against outsiders in state courts have been sanctioned. See *Felix* v. *Patrick,*

---

[3] For interesting accounts of this episode in the struggle for power between state and federal governments see IV Beveridge, The Life of John Marshall, 539–552; I Warren, The Supreme Court in United States History, c. 19. See also *Cherokee Nation* v. *Georgia,* 5 Pet. 1.

[4] See *The Kansas Indians,* 5 Wall. 737; *Ex parte Crow Dog,* 109 U. S. 556; *United States* v. *Kagama,* 118 U. S. 375; *United States* v. *Forness,* 125 F. 2d 928; *Iron Crow* v. *Oglala Sioux Tribe,* 231 F. 2d 89; *Begay* v. *Miller,* 70 Ariz. 380, 222 P. 2d 624; Cohen, Federal Indian Law (Revision by the United States Interior Department 1958); 55 Decisions of the Department of the Interior 56–64.

The Federal Government's power over Indians is derived from Art. I, § 8, cl. 3, of the United States Constitution, *Perrin* v. *United States,* 232 U. S. 478, and from the necessity of giving uniform protection to a dependent people. *United States* v. *Kagama, supra.*

145 U. S. 317, 332; *United States* v. *Candelaria,* 271 U. S. 432. See also *Harrison* v. *Laveen,* 67 Ariz. 337, 196 P. 2d 456. And state courts have been allowed to try non-Indians who committed crimes against each other on a reservation. *E. g., New York ex rel. Ray* v. *Martin,* 326 U. S. 496. But if the crime was by or against an Indian, tribal jurisdiction or that expressly conferred on other courts by Congress has remained exclusive.[5] *Donnelly* v. *United States,* 228 U. S. 243, 269–272; *Williams* v. *United States,* 327 U. S. 711. Essentially, absent governing Acts of Congress, the question has always been whether the state action infringed on the right of reservation Indians to make their own laws and be ruled by them. Cf. *Utah & Northern Railway* v. *Fisher,* 116 U. S. 28.

Congress has also acted consistently upon the assumption that the States have no power to regulate the affairs of Indians on a reservation. To assure adequate government of the Indian tribes it enacted comprehensive statutes in 1834 regulating trade with Indians and organizing a Department of Indian Affairs. 4 Stat. 729, 735. Not satisfied solely with centralized government of Indians, it encouraged tribal governments and courts to become stronger and more highly organized. See, *e. g.,* the Wheeler-Howard Act, §§ 16, 17, 48 Stat. 987, 988, 25 U. S. C. §§ 476, 477. Congress has followed a policy calculated eventually to make all Indians full-fledged participants in American society. This policy contemplates criminal and civil jurisdiction over Indians by any State ready to assume the burdens that go with it as soon as the educational and economic status of the Indians permits the change without disadvantage to

[5] For example, Congress has granted to the federal courts exclusive jurisdiction upon Indian reservations over 11 major crimes. And non-Indians committing crimes against Indians are now generally tried in federal courts. See 18 U. S. C. §§ 437–439, 1151–1163; Cohen, *op. cit. supra,* note 4, at 307–326.

them.  See H. R. Rep. No. 848, 83d Cong., 1st Sess. 3, 6, 7 (1953).  Significantly, when Congress has wished the States to exercise this power it has expressly granted them the jurisdiction which *Worcester* v. *Georgia* had denied.[6]

No departure from the policies which have been applied to other Indians is apparent in the relationship between the United States and the Navajos.  On June 1, 1868, a treaty was signed between General William T. Sherman, for the United States, and numerous chiefs and headmen of the "Navajo nation or tribe of Indians." [7] At the time this document was signed the Navajos were an exiled people, forced by the United States to live crowded together on a small piece of land on the Pecos River in eastern New Mexico, some 300 miles east of the area they had occupied before the coming of the white man.  In return for their promises to keep peace, this treaty "set apart" for "their permanent home" a portion of what had been their native country, and provided that no one, except United States Government personnel, was to enter the reserved area.  Implicit in these treaty terms, as it was in the treaties with the Cherokees involved in *Worcester* v. *Georgia,* was the understanding that the internal affairs of the Indians remained exclusively within

---

[6] See, *e. g.,* 62 Stat. 1224, 64 Stat. 845, 25 U. S. C. §§ 232, 233 (1952) (granting broad civil and criminal jurisdiction to New York) ; 18 U. S. C. § 1162, 28 U. S. C. § 1360 (granting broad civil and criminal jurisdiction to California, Minnesota, Nebraska, Oregon, and Wisconsin).  The series of statutes granting extensive jurisdiction over Oklahoma Indians to state courts are discussed in Cohen, *op. cit. supra,* note 4, at 985–1051.

[7] 15 Stat. 667.  In 16 Stat. 566 (1871), Congress declared that no Indian tribe or nation within the United States should thereafter be recognized as an independent power with whom the United States could execute a treaty but provided that this should not impair the obligations of any treaty previously ratified.  Thus the 1868 treaty with the Navajos survived this Act.

the jurisdiction of whatever tribal government existed. Since then, Congress and the Bureau of Indian Affairs have assisted in strengthening the Navajo tribal government and its courts. See the Navajo-Hopi Rehabilitation Act of 1950, § 6, 64 Stat. 46, 25 U. S. C. § 636; 25 CFR §§ 11.1 through 11.87NH. The Tribe itself has in recent years greatly improved its legal system through increased expenditures and better-trained personnel. Today the Navajo Courts of Indian Offenses exercise broad criminal and civil jurisdiction which covers suits by outsiders against Indian defendants.[8] No Federal Act has given state courts jurisdiction over such controversies.[9] In a general statute Congress did express its willingness to have any State assume jurisdiction over reservation Indians if the State Legislature or the people vote affirmatively to accept such responsibility.[10] To date, Arizona has not

---

[8] Young, The Navajo Yearbook (1955), 165, 201; *id.* (1957), 107, 110.

[9] In the 1949 Navajo-Hopi Rehabilitation Bill, S. 1407, 81st Cong., 1st Sess., setting up a 10-year program of capital and other improvements on the Reservation, Congress provided for concurrent state, federal and tribal jurisdiction. President Truman vetoed the bill because he felt that subjecting the Navajo and Hopi to state jurisdiction was undesirable in view of their illiteracy, poverty and primitive social concepts. He was also impressed by the fact that the Indians vigorously opposed the bill. 95 Cong. Rec. 14784–14785. After the objectionable features of the bill were deleted it was passed again and became law. 64 Stat. 44, 25 U. S. C. §§ 631–640.

[10] Act of Aug. 15, 1953, c. 505, §§ 6, 7, 67 Stat. 590, provides as follows: "Notwithstanding the provisions of any Enabling Act for the admission of a State, the consent of the United States is hereby given to the people of any State to amend, where necessary, their State constitution or existing statutes, as the case may be, to remove any legal impediment to the assumption of civil and criminal jurisdiction in accordance with the provisions of this Act: *Provided,* That the provisions of this Act shall not become effective with respect to such assumption of jurisdiction by any such State until the people

accepted jurisdiction, possibly because the people of the State anticipate that the burdens accompanying such power might be considerable.[11]

There can be no doubt that to allow the exercise of state jurisdiction here would undermine the authority of the tribal courts over Reservation affairs and hence would infringe on the right of the Indians to govern themselves. It is immaterial that respondent is not an Indian. He was on the Reservation and the transaction with an Indian took place there. Cf. *Donnelly* v. *United States, supra; Williams* v. *United States, supra.* The cases in this Court have consistently guarded the authority of Indian governments over their reservations. Congress recognized this authority in the Navajos in the Treaty of 1868, and has done so ever since. If this power is to be taken away from them, it is for Congress to do it. *Lone Wolf* v. *Hitchcock,* 187 U. S. 553, 564–566.

*Reversed.*

---

thereof have appropriately amended their State constitution or statutes as the case may be.

". . . The consent of the United States is hereby given to any other State not having jurisdiction with respect to criminal offenses or civil causes of action, or with respect to both, as provided for in this Act, to assume jurisdiction at such time and in such manner as the people of the State shall, by affirmative legislative action, obligate and bind the State to assumption thereof."

Arizona has an express disclaimer of jurisdiction over Indian lands in its Enabling Act, § 20, 36 Stat. 569, and in Art. XX, Fourth, of its Constitution. Cf. *Draper* v. *United States,* 164 U. S. 240.

[11] See H. R. Rep. No. 848, 83d Cong., 1st Sess. 3, 7 (1953); Secretary of Interior, Annual Report (1955), 247–248; *id.* (1956), 215–216; *id.* (1957), 253–254.