**STATE of South Dakota, ex rel. Karen A. JOSEPH, formerly Karen A. Christenson Redwing, Plaintiff and Appellee,**

v.

**Norman REDWING, Defendant and Appellant.**

**No. 15879.**

Supreme Court of South Dakota.

Considered on Briefs Jan. 15, 1988.

Decided Sept. 14, 1988.

Gary L. Gellhaus, Brown County States Atty., Aberdeen, for plaintiff and appellee.

Philip W. Morgan, Britton, and Jarvis W. Brown, Faulkton, for defendant and appellant.

MILLER, Justice.

This is an appeal from a contempt order in a child support action claiming that the circuit court lacked subject matter jurisdiction by virtue of a prior tribal court divorce. We affirm.

Both parties to this appeal are Indian. Appellant Norman Redwing (Norman) is a member of the Sisseton–Wahpeton Sioux Tribe and currently resides on Indian land. According to the stipulation of facts, appellee Karen A. Joseph, formerly Karen A. Redwing (Karen), is a member of the Ft. Yates Sioux Tribe of North Dakota but resides in Aberdeen, South Dakota (not Indian country), with the couple's daughter Chanda.

Norman and Karen lived in Aberdeen before and during their marriage, but were married in the tribal court of the Sisseton–

Wahpeton Sioux Tribe. Several months later, the tribal court entered a decree of divorce terminating the marriage. The divorce decree held that Norman was the father of the couple's then unborn child (Chanda); that he must pay child support (although no amount was set); and, further, that he must pay Karen certain sums of money per month (although not clear on the face of the tribal court decree, evidence was presented in this action that the monthly payments were in reality a property settlement). Subsequently, in September 1975, Karen commenced a divorce action in the circuit court in Brown County, South Dakota, seeking a divorce, custody of Chanda, and an award of child support from Norman. Norman, who had since moved onto trust-deeded Indian land, responded by motion, arguing that the circuit court did not have jurisdiction since the divorce had previously been granted by the tribal court. The circuit court dismissed Karen's complaint on the grounds that "there was no marriage to dissolve; that the marriage was solemnized and completed not according to South Dakota law, but according to Indian custom ... that the marriage in the first instance was valid and that the divorce was valid, but only within the confines of Indian land, and according to Indian custom." Because that holding was never appealed we cannot pass on its validity.

Several years later, in 1984, Karen filed suit in the circuit court for Brown County, seeking an award of child support from Norman.[1] (She alleged that at the time Chanda was conceived, she, Karen, was an unmarried woman, as defined by South Dakota law and as interpreted by the circuit court's order in 1975.) After a hearing, in which Norman participated, the circuit court found him to be Chanda's father (which never was disputed) and required him to pay child support. The support required was from the time of the child's birth to the date of judgment, together with further future support until the child attained the age of eighteen. Norman did not appeal this judgment of the circuit court. Later, when he failed to make child support payments, the circuit court, after a hearing, found Norman in contempt and ordered that he be incarcerated in the county jail for sixty days.

On appeal, Norman raises as his sole issue that the circuit court erred in finding him in contempt because it lacked *subject matter* jurisdiction.[2] He argues that the tribal court marriage and tribal court divorce decree must be recognized in the state circuit court on the basis of comity and, as a result, only the tribal court had jurisdiction to set child support payments.

It is settled law that tribal court orders should be recognized in state courts under the principle of comity. *Mexican v. Circle Bear*, 370 N.W.2d 737 (S.D.1985). However, under SDCL 1-1-25, state courts may not recognize tribal court orders unless the party seeking recognition establishes by clear and convincing evidence that (1) the tribal court had jurisdiction over both the subject matter and the parties; (2) the order or judgment was not fraudulently obtained; (3) the order or judgment was obtained by a process that assures the requisite of an impartial administration of justice, including but not limited to due notice and a hearing; (4) the order or judgment complies with the laws of the jurisdiction in which it was obtained; and (5) the order or judgment does not contravene the public policy of the State of South Dakota. *See also Hilton v. Guyot*, 159 U.S. 113, 16 S.Ct. 139, 40 L.Ed. 95 (1895). Here, Norman has made no showing that the tribal court divorce decree met the mandatory requisites for the application of the doctrine of comity set forth in SDCL 1-1-25. Therefore, we could hold that Norman has failed to meet his burden of showing lack of subject matter jurisdiction.

1. We note that subsequent to the filing of the complaint there were significant amendments and revisions, substantive and procedural, of the paternity/child support statutes. S.D.Sess. L.1984, ch. 190.

2. Presumably, Norman recognized that the circuit court had personal jurisdiction over him pursuant to SDCL 15-7-2(7).

However, it is not necessary for us to delve into or address the state court/tribal court comity issues. The specific, precise issue raised by appellant is whether the state court had "subject matter" jurisdiction, and it is clear that it did.

The "subject matter" of this litigation is the child support obligation owed by Norman. Black's Law Dictionary 1278 (5th ed. 1979), defines "subject-matter" as

[t]he subject, or matter presented for consideration; the thing in dispute; the right which one party claims as against the other, as the right to divorce; ... [n]ature of cause of action, and of relief sought ...

Further, *Black's, supra,* defines "subject-matter jurisdiction" as referring to

[a] court's competence to hear and determine cases of the general class to which proceedings in question belong; the power to deal with the general subject involved in the action ... [and] deals with the court's competence to hear a particular category of cases.

*See also Janssen v. Tusha,* 68 S.D. 639, 5 N.W.2d 684 (1942); 21 C.J.S. *Courts* §§ 28, 35 (1940).

As stated by Justice Henderson in *State ex rel. Wieber v. Hennings,* 311 N.W.2d 41, 42 (S.D.1981),

A minor has an inherent right to support from its natural parents; this right exists at common-law and is separate and distinct from any statutory obligation.

*See also State ex rel. Stearns v. Blume,* 333 N.W.2d 721 (S.D.1983); *Johansen v. Johansen,* 305 N.W.2d 383 (S.D.1981); *State v. Zobel,* 81 S.D. 260, 134 N.W.2d 101 (1965); *Matthews v. Matthews,* 71 S.D. 115, 22 N.W.2d 27 (1946); *Haakon County v. Staley,* 60 S.D. 87, 243 N.W. 671 (1932); *McCook County v. Kammoss,* 7 S.D. 558, 64 N.W. 1123 (1895).

Here, it arguably would have been preferable for Karen to attempt to enforce the child support obligation in tribal court rather than pursuing a remedy in state court.

However, Karen's action here is much the same as we previously approved in *Johansen, supra,* when we permitted a South Dakota circuit court to similarly modify and enforce the child support provisions in a divorce decree from Minnesota.

Since Norman has a common law obligation to support Chanda, irrespective of any statutory provisions, the trial court here had *subject matter* jurisdiction which it properly recognized and enforced.

AFFIRMED.

MORGAN, J., concurs.

WUEST, C.J., concurs specially.

HENDERSON and SABERS, JJ., dissent.

WUEST, Chief Justice (specially concurring).

With all due respect to the dissenting opinions, I believe comity is not the issue in this case. Norman is appealing the trial court's decision which held him in contempt of the judgment ordering him to make child support payments. He should have raised the comity issue in the paternity support proceeding which was decided in 1985.* In any event, the judgment was never appealed and the decision of the trial court became final.

During the recent contempt proceeding now on appeal, the jurisdiction issue was discussed as follows:

THE COURT: Right. But once he's in the court—actually, everything revolves around jurisdiction. I don't think they're really disputing anything except jurisdiction; isn't that right?

MR. MORGAN: Yes, jurisdiction is the question, yes.

THE COURT: Once this is resolved, if we don't have jurisdiction, everything is moot, anyway.

MR. GELLHAUS: My concern is that the original order which was entered back in—I don't have the date of the

---

* There is no transcript of the proceedings in the paternity action nor an answer to the paternity complaint in the settled record. The judgment, however, states that the matter was heard on its merits and that both parties were present with their attorneys. The memorandum opinion states that the only issues were paternity and support.

order, but the July 7th, '84 hearing where you originally made your order, I guess it's our position that the appeal time has run on that.

THE COURT: That's true, but they have a new one on contempt, and I suppose they could go back into the original—one thing on jurisdiction, if you don't have jurisdiction, you never had jurisdiction, no matter what has happened, if the Supreme Court takes that position. It's from an exception. In other words, I don't think—if I have jurisdiction, you will be right, but if I don't have jurisdiction and it's an issue, and they're complaining on this order, then it goes back to the original starting point and you have to have jurisdiction at the time you do it. That's something I don't think you can lose by default. We'll find out.

Stipulation on Order to Show Cause dated 5–14–87 at 4–5.

The issue before this court is whether the appellant can collaterally attack the 1985 support order, claiming lack of subject matter jurisdiction. The answer is no. As indicated in the majority opinion, the state has subject matter jurisdiction. The tribal courts probably have jurisdiction in this type of case in Indian country. Perhaps this court would have granted comity had the issue been presented to us. Speculating on hypothetical situations, however, has no relationship to the issue before this court, *i.e.*, subject matter jurisdiction. Comity is a non-issue in this contempt proceeding.

HENDERSON, Justice (dissenting).

With, as Abraham Lincoln taught us, malice towards none and charity for all; with an abiding belief that our tribal courts throughout this nation, as well as South Dakota, must play an indispensable role in governing the affairs of our Red Brothers, I most respectfully dissent, believing that the adjudication of this civil dispute must be litigated in the tribal courts.

South Dakota encompasses nine Indian Reservations. Each has an active tribal court. Of these reservations, seven have tribal courts which originate in a tribal sovereignty predating the United States Constitution. They are: Cheyenne River Sioux Reservation, Crow Creek Sioux Reservation, Lower Brule Sioux Reservation, Oglala (Pine Ridge) Sioux Reservation, Rosebud Sioux Reservation, Sisseton–Wahpeton Sioux Reservation,[1] and Standing Rock Sioux Reservation. Flandreau–Santee Tribal Court and Yankton Sioux Tribal Court are the remaining two tribal courts which are derived from federally created Courts of Indian Offenses. All of these courts are subject to Congressional authority. The importance of tribal courts was recently recognized in *Iowa Mut. Ins. Co. v. LaPlante*, 480 U.S. 9, 107 S.Ct. 971, 94 L.Ed.2d 10 (1987):

Tribal courts play a vital role in tribal self-government, and the Federal Government has consistently encouraged their development. Although the criminal jurisdiction of the tribal courts is subject to substantial federal limitation, their civil jurisdiction is not similarly restricted. If state-court jurisdiction over Indians or activities on Indian lands would interfere with tribal sovereignty and self-government, the state courts are generally divested of jurisdiction as a matter of federal law.

*LaPlante*, 480 U.S. at ——, 107 S.Ct. at 976, 94 L.Ed.2d at 19 (citations omitted; footnote omitted).

The State court lacked subject-matter jurisdiction. The majority classifies this as an appeal from a contempt order in a child support action. That is a totally misleading characterization of the record. The current case was an attempt to enforce child support provisions of an earlier paternity proceeding. Karen Joseph's complaint, filed on February 27, 1984, in the

---

1. This entity, formerly the Lake Traverse Indian Reservation, was technically terminated as a "reservation" in 1891, but retains some attributes of reservation status. *See DeCoteau v. District County Court*, 420 U.S. 425, 95 S.Ct. 1082,

43 L.Ed.2d 300 (1975) (Indian conduct on "trust allotment" land within this terminated reservation's 1867 borders is the concern of tribal or federal authorities).

circuit court for Brown County, contained the following allegations:

### I.

That Karen A. Joseph, above-named plaintiff, is a married woman and is a resident of Aberdeen, Brown County, South Dakota.

### II.

That on or about February 23, 1975, plaintiff gave birth to a baby girl whose name is Chanda Marie Redwing.

### III.

That the above-named Defendant, Norman Redwing, is the father of the said Chanda Marie Redwing by virtue of an act of sexual intercourse that took place between the Plaintiff and the Defendant in approximately May of 1974, at which time Plaintiff was an unmarried woman as defined by South Dakota law and interpreted in the Memorandum Decision of Karen A. Redwing, Plaintiff vs. Norman J. Redwing, Defendant (CIV. 75–478) attached. The plaintiff remained unmarried as defined by South Dakota law until January 23, 1976.

### IV.

That Chanda Marie Redwing is also a resident of Aberdeen, Brown County, South Dakota and has never been adopted or been involved in any litigation terminating or establishing parental rights as recognized or defined under South Dakota law. (See Memorandum Decision (CIV. 75–478), Karen A. Redwing, Plaintiff vs. Norman J. Redwing, Defendant). That the Defendant has, in the past, furnished small amounts of monies to the Plaintiff for the support of the minor child, Chanda Marie Redwing.

Karen's prayer for relief in the action was as follows:

WHEREFORE, Plaintiff prays and demands that the Defendant be brought before this Court to answer the above charges; that the Defendant be held liable for the necessary maintenance, education, support and custodial duties performed for said child since birth; that the Court grant the Plaintiff future maintenance, education, support and custodial duties performed for said child in the amount of $310.00 per month; that the Court grant the Plaintiff costs in the amount of $43.00 for service of process, reasonable attorney's fees, and such further relief as the Court deems just and equitable in the premises.

This complaint indicates that the action was a paternity suit, under SDCL ch. 25–8, which is entitled "Paternity Proceedings." In *State ex rel. Stearns v. Blume*, 333 N.W.2d 721 (S.D.1983), this Court distinguished a civil action based on the common law duty of a father to support his minor child from a ch. 25–8 paternity proceeding by finding that the action in question did not follow ch. 25–8 procedures.[2] In so finding, this Court stressed five statutory procedures which were not followed:

1) The mother was not made a party defendant (SDCL 25–8–10);

2) The complaint was not made to a judge or magistrate having power to commit for trial (SDCL 25–8–13);

3) The complaint was not verified by the mother (SDCL 25–8–14);

4) There was no demand that the father be brought before the judge or magistrate to answer the charge (SDCL 25–8–15); and

5) No warrant was issued for apprehension of the defendant (SDCL 25–8–16).

*Stearns*, 333 N.W.2d at 724.

Comparison of the record, in this case, to the statutory provisions of SDCL ch. 25–8, then in effect, reveals that all five of the statutes referenced in *Stearns* were followed, to wit:

1) SDCL 25–8–10 provided that the mother could bring the action herself (*Stearns* involved an action brought

---

**2.** The statutes detailing these procedures were subsequently repealed by 1984 S.D.Sess.L. ch. 190 (House Bill 1043), but were in effect at the time that this action was commenced.

by the State, under a different part of SDCL 25–8–10);

2) The matter was brought before Judge Dobberpuhl, a judge having the power to commit for trial (SDCL 25–8–13);

3) The complaint was verified by Karen Joseph (SDCL 25–8–14);

4) The prayer for relief demanded that the defendant be brought before the court to answer the charges (SDCL 25–8–15); and

5) A warrant for the defendant's arrest was issued by Judge Dobberpuhl on February 27, 1984 on the same day that Karen Joseph filed her complaint (SDCL 25–8–16).

As the complaint was drafted to fit SDCL ch. 25–8, this was a paternity proceeding. The circuit court entered an Order of Judgment of Paternity, and ordered Norman Redwing to pay $125 per month in child support, together with $8,400 for 112 months of child support in arrears. On January 21, 1987, the Brown County State's Attorney filed a petition seeking payment of unpaid child support ordered in the previous proceeding. The 1987 case was an attempt to enforce the child support award in the 1984–1985 paternity proceeding, to which the petition referred. Neither proceeding was valid, as subject-matter jurisdiction was lacking in the paternity case, from which the 1987 child support proceeding was derived. Subject-matter jurisdiction must appear affirmatively from the record, and this Court is required, *sua sponte*, to take note of jurisdictional deficiencies, whether presented by the parties or not. *State v. Phipps*, 406 N.W.2d 146, 148 (S.D.1987); *Lehr v. Department of Labor*, 391 N.W.2d 205, 206 (S.D.1986); *State v. Waldner*, 381 N.W.2d 273, 275 (S.D. 1986); *State v. Oban*, 372 N.W.2d 125, 130 (S.D.1985); *State v. Huftile*, 367 N.W.2d 193, 195 (S.D.1985).

The reason the circuit court lacked subject-matter jurisdiction is that jurisdiction over this matter resided in the Sisseton–Wahpeton Sioux Tribal Court. Both Norman and Karen are Indians.[3] They were married in the tribal court on January 7, 1974, and divorced in the same tribal court on or about November 13, 1974. Subsequent events indicate that Karen indulged in "forum-shopping." The tribal court conducted a hearing concerning the custody of Chanda Marie on September 16, 1975, which resulted in an order placing Chanda Marie under the custody of the Sisseton–Wahpeton Sioux Tribal Juvenile Court, and giving temporary custody to Shirley Johnson, the child's aunt. The day after the hearing, September 17, 1975, Karen filed a complaint in state court seeking a divorce and custody of Chanda Marie, although the tribal courts had dissolved the marriage in 1974. Later, Karen sought child support in the tribal court. Although the tribal court interpreted its divorce decree as including set amounts of child support, the state circuit court, in April 1987, reinterpreted the tribal decree, holding that no amounts were set regarding child support, and that the amounts specified were really a form of property settlement.

This seesaw battle, bouncing from tribal court to state court, is an illustration of our state courts undermining the authority of the tribal courts. "[T]he tribal courts are often the single most important vestige of tribal sovereignty on the reservations." Clinton, *Criminal Jurisdiction over Indian Lands: A Journey Through a Jurisdictional Maze*, 18 Ariz.L.Rev. 503, at 557 (1976). Although Sioux tribal codes and appellate procedures are sophisticated (Note, *Recognition of Tribal Decisions in State Courts*, 37 Stan.L.Rev. 1397, 1415 n. 105 (1985)), Karen has switched to the state courts as it suits her. This is in marked contrast to the situation in *Johansen v. Johansen*, 305 N.W.2d 383, 387 (S.D.1981), cited in the majority opinion, where this Court noted the inconvenience and expense of the plaintiff being forced to travel to Minnesota or Wyoming to seek support for her child. *Johansen* rested jurisdiction, ultimately, on SDCL 15–7–2(7). *Johansen*, 305 N.W.2d at 387. As the majority notes, SDCL 15–7–2(7) deals with personal, not

---

**3.** Norman is a member of the Sisseton–Wahpeton Tribe and lives on Indian trust land, while Karen is a member of the Ft. Yates Sioux Tribe in North Dakota.

subject-matter, jurisdiction. *Johansen* also did not deal with Indians, and questions of tribal court jurisdiction, where different policy concerns arise. Given the extensive contact with the tribal court in this case, from the marriage up to and including an order awarding Karen custody of Chanda Marie in August 1984 referred to in the appellee's brief, the jurisdictional question is not so simple as the majority opinion indicates. Rather than confronting a "risk" of conflicting adjudications undermining tribal court authority, this case presents a frontal assault on such courts.

While accepting the general rule that states have broad authority over Indians outside the reservation (*see,* for example, *Mescalero Apache Tribe v. Jones,* 411 U.S. 145, 93 S.Ct. 1267, 36 L.Ed.2d 114 (1973)), the facts of this case weigh against state jurisdiction. In *Wisconsin Potowatomies v. Houston,* 393 F.Supp. 719 (W.D.Mich. 1973), an often-cited child custody case, the court wrote:

> It would seem to the court that while physical presence within or without the reservation may for most purposes be sufficient to dispose of the issues of jurisdiction, it is not sufficient to resolve the issues presented here.

*Id.* at 731. The court resolved the jurisdictional question by determining that the domicile of the Indian children in question, at the time the state court took physical custody, remained the reservation and that the state court, therefore, lacked jurisdiction. In *In re Adoption of Buehl,* 87 Wash.2d 649, 555 P.2d 1334 (1976), the Washington Supreme Court observed that a minor generally takes the domicile of the parent with whom the child lives, the domicile of a child who is a ward of the court is the location of the court. *Buehl,* 87 Wash.2d at 660–61, 555 P.2d at 1340–41. In the present case, the tribal court placed Chanda Marie under the aegis of the tribal juvenile court in 1975. Child-custody was before it as late as October 10, 1984, when custody was awarded to Karen pursuant to a tribal court hearing held on August 30, 1984. Child support was before it on September 17, 1985, when the tribal court ordered Norman to pay Karen $625 in child support arrearages. Here, the tribal court had jurisdiction from beginning to end. The Order of Judgment of Paternity by the state court was a total nullity, as there was no paternity to establish, paternity and child support having been determined by the tribal court in its divorce decree of November 13, 1974.

The majority's argument that the state court could ignore the tribal orders and decrees pursuant to SDCL 1–1–25 fails because that statute was not put into effect until July 1, 1986, long after the paternity proceeding was completed in the state court; that judgment was dated March 14, 1985.

Indian tribal custom marriages and divorce have long been recognized by both federal and state government. This is not under the Full Faith and Credit Clause (U.S. Const. art. IV, § 1), but under the rationale typically seen in *Begay v. Miller,* 70 Ariz. 380, 222 P.2d 624 (1950). Note specific language in *Begay,* 222 P.2d at 628: "[W]e recognize it [*i.e.,* the validity of the tribal divorce decree] because of the general rule, call it by whatever name you will, that a divorce valid by the law where it is granted is recognized as valid everywhere."

It could easily be argued that the opinion written by Justice Wollman in *Mexican v. Circle Bear,* 370 N.W.2d 737 (S.D.1985), cited in the majority, would be binding precedent in this case. "We join with those courts that have held that tribal court orders should be recognized in state courts under the principle of comity." *Id.* at 741 (citations omitted). Or it could also be argued that the concurrence in result by this author recognizing judicial comity in said citation could be used as precedent.

> [I] ascribe to the belief, in law, that there is a distinction between judicial comity and comity of nations. Comity is begotten from the womb of mutual respect and is not a child of obligation. We must live in mutual respect with our Indian brothers who serve on the trial courts of the various Indian reservations in South Dakota. They, in return, should likewise

extend unto our courts reciprocating courtesy and respect.

*Mexican v. Circle Bear,* 370 N.W.2d at 742 (Henderson, J., concurring in result). *Begay's* rationale is but another reason for recognition of the tribal court's decision on November 13, 1974.

In 1985, Karen Redwing initiated an order to show cause hearing in tribal court concerning child support. She still recognized the tribal court's jurisdiction. In fact, in testimony before this state trial judge, Karen Redwing testified that there had been several hearings in tribal court for support. For supporting authority that the state has no jurisdiction and it continues to belong to the tribe, see *State ex rel. Three Irons v. Three Irons,* 621 P.2d 476 (Mont.1980), and *State ex rel. Flammond v. Flammond,* 621 P.2d 471 (Mont.1980).[4] The Supreme Court of Montana dismissed Uniform Reciprocal Enforcement of Support Actions brought by the wives, for lack of personal and subject-matter jurisdiction. The judgment below is void.

It is a psychosocial dynamic foisted upon the Indian people to inculcate within their culture and judicial system (their tribal courts) a belief that their tribal decrees of divorce are meaningless. Only chaos and a topsy-turvy jurisdictional world unfolds (*i.e.,* am I *really* divorced? Am I still married to Jenny—but golly—Margie is my wife? Don't I *really* have to pay child support under the tribal decree?).[5] The Sisseton–Wahpeton Tribe, under the Sisseton–Wahpeton Tribal Code ch. 34 (1982), which pertains to marriage and divorces, gives subject-matter jurisdiction to the tribal court in such matters.

Let us review—what we on this Court said—not too long ago:

The proper inquiry is whether the actions of the state would infringe on the right of reservation Indians to make and be governed by their own laws. *Williams v. Lee,* 358 U.S. 217, 79 S.Ct. 269, 3 L.Ed.2d 251 (1959); *Utah & Northern R. Co. v. Fisher,* 116 U.S. 28, 6 S.Ct. 246, 29 L.Ed. 542 (1885). *Even when a tribal member is off the reservation, tribal courts provide the appropriate forum for settlement of disputes over personal and property interests of Indians that arise out of tribal relationships. Fisher v. District Court,* 424 U.S. 382, 96 S.Ct. 943, 47 L.Ed.2d 106 (1976); *Williams v. Lee, supra.* Indian relations are of an anomalous and complex character, and tribal courts are better able than other forums to evaluate questions of Indian traditions. *Santa Clara Pueblo v. Martinez,* 436 U.S. 49, 98 S.Ct. 1670, 56 L.Ed.2d 106 (1978); *United States v. Quiver,* 241 U.S. 602, 36 S.Ct. 699, 60 L.Ed. 1196 (1916). *To justify the application of a state law affecting these relations there must be some clear provision to that effect.[6] Quiver,* 241 U.S. at 606, 36 S.Ct. at 700. It follows that when tribes have the power to make their own substantive law in internal matters they also have the power to enforce those laws in their own forums.

The fact that the children in this case spent some time off the reservation is not determinative of the proper forum. Even though a member of an Indian

---

4.  These Montana cases are progeny of *Fisher v. District Court,* 424 U.S. 382, 96 S.Ct. 943, 47 L.Ed.2d 106 (1976), where the United States Supreme Court, in the context of child custody, held tribal court jurisdiction to be exclusive, as state court jurisdiction would create the risk of conflicting adjudication, causing a corresponding decline in the authority of tribal courts.

5.  Perhaps more impactual is this scenario: Chanda Marie Redwing was born in wedlock because of her parents' tribal marriage. She was not born out of wedlock and she should not be the subject of a paternity action. This is precisely the conflict *Fisher v. District Court* warned of (*see* note 4, *supra* ).

6.  Footnote 2 of the majority opinion attempts to envelop in SDCL 15–7–2 the entire personal jurisdiction that the Sisseton–Wahpeton Sioux Tribal Court has; it cannot be done. SDCL 15–7–2(7) and (8) do not specify Indians, so there is no "clear provision" indicating that this statute was to apply to them, in derogation of the tribal court system. *See LaPlante,* 480 U.S. at ——, 107 S.Ct. at 977–78, 94 L.Ed.2d at 20–22 (rejecting the argument that federal diversity jurisdiction overrides the federal policy of deference to tribal courts).

tribe may be outside the territorial boundaries of the reservation, the tribal government may regulate the absent member's affairs involving questions of membership, *Roff v. Burney*, 168 U.S. 218, 18 S.Ct. 60, 42 L.Ed. 442 (1897), and *questions of domestic relations, United States v. Quiver, supra.* The locus of the act of a member is not conclusive. Rather, the test is a broader one, hinging on whether the matter demands exercise of the tribe's responsibility of self-government. *Williams v. Lee*, 358 U.S. 217, 79 S.Ct. 269, 3 L.Ed.2d 251 (1959); *Littell v. Nakai*, 344 F.2d 486 (9th Cir. 1965). There can be no greater threat to essential tribal relations and to the tribal power of self-government than to interfere in questions of custody of tribal members.

*In re Guardianship of D.L.L. & C.L.L.*, 291 N.W.2d 278, 281 (S.D.1980) (emphasis supplied; footnote added).

This right of Indian tribes to govern their own affairs is the rationale adopted by North Carolina courts in holding that state courts lack subject-matter jurisdiction in paternity/child support actions where tribal courts have been established. *See Wildcatt v. Smith*, 69 N.C.App. 1, 316 S.E. 2d 870 (1984) (*cited with approval* by the North Carolina Supreme Court in *Jackson County Child Support Enforcement Agency ex rel. Jackson v. Swayney*, 319 N.C. 52, 352 S.E.2d 413 (1987), *reh'g denied*, 319 N.C. 412, 354 S.E.2d 713 (1987), *cert. denied,* — U.S. —, 108 S.Ct. 93, 98 L.Ed.2d 54 (1987)). In *Wildcatt*, the North Carolina Court of Appeals reversed a lower state court's finding that an Indian defendant was in contempt for failing to comply with a prior state court paternity/child support judgment issued prior to creation of tribal courts. The establishment of such tribal courts, after the initial judgment, stripped state courts of subject-matter jurisdiction, notwithstanding the general rule that a court retains jurisdiction to correct or enforce its earlier judgments despite loss of jurisdiction after entry of its final

decree. *Wildcatt,* 69 N.C.App. at 11, 316 S.E.2d at 877. "It is clear that any exercise of state power after the creation of the Indian court system would unduly infringe upon the tribe's asserted right of self-government." *Id.* This holding of the North Carolina Supreme Court ties in directly with the passage quoted at the beginning of this writing from *Iowa Mut. Ins. Co. v. LaPlante*, 480 U.S. at —, 107 S.Ct. at 976, 94 L.Ed.2d at 19. In *LaPlante*, the United States Supreme Court further observed that, although Congress, in 1924, declared Indians born in the United States to be United States citizens, and thus citizens of the states in which they reside, via the Fourteenth Amendment, "[t]here is no indication that this grant of citizenship was intended to affect federal protection of tribal self-government." *LaPlante*, 480 U.S. at —, n. 10, 107 S.Ct. at 977, n. 10, 94 L.Ed.2d at 21 n. 10. If the North Carolina state courts lacked jurisdiction to enforce their own paternity/child support judgments due to a later interposition of a tribal court system, the state courts of South Dakota cannot adjudicate similar matters when the local tribal courts have been involved from the beginning. We should not usurp Congressional intent nor should we interfere with the Sisseton–Wahpeton Sioux Tribal Court. It had jurisdiction, and never lost it.

Therefore, I respectfully dissent. Spiritually, I would have a peaceful and cooperative coexistence between the "white man's court" (as the Indians call it) and these tribal courts. Gratefully do I acknowledge the beautiful work[7] of Frank Pommersheim, Chair, Indian Law Committee, University of South Dakota School of Law, not to mention outstanding attorneys in this state who researched and conferred with prominent tribal court judges on the reservations. From the Committee's work product, I have gleaned (hopefully) a further insight into the workings of tribal courts and the expressions of confidence in them as enunciated by the United States Supreme Court. Therefore, I issue my expression of dissent lacking the necessary

---

7. F. Pommersheim, *South Dakota Tribal Court Handbook* (March 1988).

votes of my Brothers who serve on this Honorable Court with me.

My Brothers on this Court conceptualize that the state may seize subject-matter jurisdiction through the operation of SDCL 1–1–25 due to noncompliance therewith. *Mexican v. Circle Bear*, 370 N.W.2d 737, was decided in 1985. Therefore, it is obvious that *Mexican* did not address this statute. *Mexican* did address *Hilton v. Guyot*, 159 U.S. 113, 16 S.Ct. 139, 40 L.Ed. 95 (1895), and paraphrased four preconditions to comity which now appear to be codified by our State Legislature. *Mexican*, 370 N.W.2d at 740. *Hilton* is an 1895 case in the United States Supreme Court. I am relying on holdings of the United States Supreme Court in the last three years: *National Farmers Union Ins. Cos. v. Crow Tribe of Indians*, 471 U.S. 845, 105 S.Ct. 2447, 85 L.Ed.2d 818 (1985), and *Iowa Mut. Ins. Co. v. LaPlante*, 480 U.S. 9, 107 S.Ct. 971, 94 L.Ed.2d 10 (1987). *Hilton*, in 1895, dealt with the sovereign nation of France; the courts of France have never been taken under the wing of the United States Congress as have the tribal courts. Therefore, South Dakota has no right to establish a five-pronged rule to meet the "requisites for the application of the doctrine of comity," as the majority would have it. We have, then, before us, by the 1986 state statute and the decisions of the Highest Court in this Land, not to mention the Supremacy Clause of the United States Constitution, a classic conflicts-of-law jurisdictional problem. Which should prevail? I answer by stating that the Indians know about Indians; they know their history, and understand their cultural heritage. Mr. Justice Marshall tells us in *LaPlante* that the federal government has consistently encouraged the development of tribal self-government by supporting tribal courts. *LaPlante*, 480 U.S. at ——, 107 S.Ct. at 976, 94 L.Ed.2d at 19. Professor Pommersheim, *South Dakota Tribal Court Handbook* at 2, reminds us that tribal courts of South Dakota have a history of less than fifty years of existence. They are but infants in the world of law. When one compares them to our courts in the state and federal systems, it becomes obvious they are growing, evolving, learning, probing, searching, and trying to become courts of respectability and dignity. This they try to accomplish for the benefit of their own people under the scheme of the federal statutes and United States Supreme Court decisions. I would permit them to attain an equivalence of respectability and sanctity with the white man's court. Have I not earlier pointed out that we have nine tribal reservations in South Dakota, each having a system of tribal courts? Either these tribal courts mean something or they do not. And I say that they do. As one commentator has written:

> Disregarding tribal court decisions allows state courts to avoid the task of interpreting and applying unfamiliar tribal law. This approach is easiest for a state court because the judge avoids complex rationales for why principles of comity do or do not apply or how far full faith and credit should extend. This approach, however, also interferes substantially with current American Indian policy. Two separate lines of reasoning argue against states ignoring tribal courts. First, when state courts refuse to abide by tribal court decisions, they implicitly deny the sovereignty of the tribes, contrary to congressional policy. Second, the failure to recognize tribal courts flies in the face of congressional and federal judicial policy according tribal courts authority equal to state courts when they have proper jurisdiction.

Note, *Recognition of Tribal Decisions in State Courts*, 37 Stan.L.Rev. 1397, at 1409 (1985).

For every end, there must be a beginning. Here, there was an ending in state trial court, but the beginning was in tribal court. Without a question, the state trial court lacked subject-matter jurisdiction from the outset. Clearly, the majority opinion has forgotten the beginning (tribal divorce action) and focused on the ending (state paternity action). Verily I say, that lacking authority to readjudicate paternity, the trial court's attempt to enforce the result of that paternity suit was, perforce, unauthorized.

SABERS, Justice (dissenting).

I dissent. The tribal court had jurisdiction to determine that a tribal marriage existed, enter a decree of divorce, determine that Norman was the father of the couple's then unborn child (Chanda) and must pay child support (although no amount was set). The parties by their conduct clearly recognized the tribal court's jurisdiction as will be shown in more detail later. The tribal court decree is entitled to comity under *Mexican v. Circle Bear*, 370 N.W.2d 737 (S.D.1985) and under SDCL 1-1-25.

Although the tribal court does not have exclusive jurisdiction of this matter, its decree is entitled to comity as any other foreign decree. Both Karen and Norman recognized this by their conduct. Karen abided by the tribal court's order to award temporary custody of Chanda to the child's aunt while Karen sought counseling. Later, Karen moved and successfully regained custody of Chanda. Further, Karen returned to the tribal court to have the amount of support determined and enforced, and Norman returned to the tribal court to have the amount reduced.

The state circuit court recognized this in 1975 and dismissed Karen's complaint for divorce on the grounds that:

> There [was] no marriage to dissolve; that the marriage was solemnized and completed not according to South Dakota law, but according to Indian custom, ... [T]hat the marriage in the first instance was valid and the divorce was valid, but only within the confines of Indian land, and according to Indian custom.

The tribal decree also determined that Norman was the father of Chanda and was obligated for child support. Incredulously, the majority opinion says it cannot pass on the validity of the circuit court decree because it was not appealed. Just the opposite is true. The circuit court decision was a valid circuit court decision. Since it was not appealed, it is res judicata, binding upon the parties and the law of the case. Therefore, footnote 5 of Justice Henderson's dissent is on point:

Perhaps more impactual is this scenario: Chanda Marie Redwing was born in wedlock because of her parents' tribal marriage. She was not born out of wedlock and she should not be the subject of a paternity action. This is precisely the conflict *Fisher v. District Court* warned of. . . .

The majority opinion attempts to side step the real issue by stating:

> However, it is not necessary for us to delve into or address the state court/tribal court comity issues. The specific, precise issue raised by appellant is whether the state court had "subject matter" jurisdiction, and it is clear that it did.

What is clear is that the tribal court had already determined the paternity of the child and the obligation for support. Since that is the same "subject matter" as this "new" paternity and support action the circuit court must begin with the tribal court decree and orders and not with a new factual determination. Therefore, Norman was right and the circuit court did not have subject matter jurisdiction to begin again. It only had jurisdiction to interpret, enforce, and/or modify the tribal court decree and orders.

The majority opinion wholly fails to mention the significant action taken by both Karen and Norman in tribal court since the original tribal court decree. Instead of determining the question of paternity anew, the circuit court should have accepted the tribal court decree and any subsequent orders entitled to comity, and then determined the present status of the case. We should reverse and remand for that purpose.