# Supreme Court of the Navajo Nation

### In re: Validation of Marriage of Loretta Francisco
### Decided August 2, 1989

## OPINION

Before TSO, Chief Justice, BLUEHOUSE and AUSTIN, Associate Justices.

Nona Lou Etsitty, Esq., Navajo Legal Aid and Defender Service, Window Rock, Arizona, for the Appellant; and John A. Chapela, Esq., Window Rock, Arizona, for the Appellee.

Opinion delivered by BLUEHOUSE, Associate Justice.

## I

This is a marriage validation case in which the Appellant, Loretta Francisco, appealed the July 20, 1988 decision of the Window Rock District Court denying validation of her common-law marriage.

Oliver Chaca and Loretta Francisco cohabitated as man and wife between approximately October 1978 and August 7, 1987 in Window Rock, Arizona. Chaca worked in Peach Springs, Arizona. Francisco, an enrolled member of the Navajo Tribe, and Chaca, a Hopi, combined their earnings, acquired personal property in both of their names, and accumulated debts in both of their names. The public knew of the parties' relationship. Chaca often introduced himself and Francisco as husband and wife, and visited Francisco at her place of employment. No children were born to the couple. Sometime in June 1987, they talked about marrying each other, but they did not obtain a marriage license, marry according to Arizona state law, or participate in a traditional Navajo wedding ceremony.

On August 7, 1987, Chaca died as the result of an automobile accident. Among the property for distribution among Chaca's heirs is the proceeds from the decedent's Federal Employees' Group Life Insurance policy. Francisco cannot collect any portion of the life insurance proceeds unless her common-law marriage is validated.

The Window Rock District Court applied 9 N.T.C. § 2 to the parties' relationship and ruled that the statute means that Navajos can validly contract marriage with non-Navajos only in compliance with applicable state or foreign law. *Validating the Marriage of Garcia*, 5 Nav. R. 30, 31 (1985). The district court

found that although the parties' relationship met the three elements of a common-law marriage, as set forth in *In re Marriage of Ketchum*, 2 Nav. R. 102 (1979), Arizona did not recognize common-law marriages. *In re Estate of Trigg*, 3 Ariz. App. 385, 387; 414 P.2d 988, 990 (1966). The district court refused to validate the parties' marriage because they failed to contract it according to Arizona law.

## II

The subject of marriage within the Navajo Nation is perplexing because of the outdated and confusing laws found in Title 9 of the Navajo Tribal Code. Consequently, the Navajo courts are faced with the difficult task of reconciling the Navajo Tribal Council's intent with the parties' expectations in recovering veterans' and other benefits. *See, e.g., In re Marriage of Daw*, 1 Nav. R. 1 (1969). The lack of a coherent Navajo domestic relations code has caused Navajo courts to mingle common-law marriage with traditional Navajo marriage. *See, e.g., id.* However, these two kinds of marriages differ substantially. A common-law marriage is "not solemnized in the ordinary way (i.e. non-ceremonial) but created by an agreement to marry followed by cohabitation.... Such marriage requires a positive mutual agreement, permanent and exclusive of all others, to enter into a marriage relationship, cohabitation sufficient to warrant a fulfillment of necessary relationship of man and wife, and an assumption of marital duties and obligations.... Such marriages are invalid in many states." Black's Law Dictionary 251 (5th ed. 1979). This type of marriage is a product of Anglo practice that is unknown and unrecognized in traditional Navajo society.

By contrast, contracting a traditional Navajo marriage has been described as follows:

1) The parties to the proposed marriage shall have met and agreed to marry.
2) The parents of the man shall ask the parents of the women for her hand in marriage.
3) The bride and bridegroom then eat cornmeal mush out of the sacred basket.
4) Those assembled in the hogan then give advice for a happy marriage to the bride and groom.
5) Gifts may or may not be exchanged.

*Navajo Tribal Council Resolution* CJ-2-40 (June 3, 1940).

"Traditional Navajo society places great importance upon the institution of marriage. A traditional Navajo marriage, when consummated according to a prescribed elaborate ritual, is believed to be blessed by the 'Holy People.' This blessing ensures that the marriage will be stable, in harmony, and perpetual." *Navajo Nation v. Murphy*, 6 Nav. R. 10, 13 (1988). Under traditional Navajo thought, unmarried couples who live together act immorally because they are said to steal each other. Thus, in traditional Navajo society the Navajo people did not approve of or recognize common-law marriages.

In 1940, the Navajo Tribal Council observed that "while the majority of the

Navajos who have the advantage of an educdtion prefer church and state marriages, the overwhelming majority of those who have not been to school are married by tribal custom." *Navajo Tribal Council Resolution* CJ-2-40 (June 3, 1940). Prior to the date of this resolution, and even several years after, Navajos, almost all of whom lived completely within an oral culture, had no use for marriage licenses. Yet today, most Navajos conduct affairs — such as obtaining federal government benefits, credit, and education — involving Anglo institutions that often demand written proof of marriage.

After partaking in the traditional Navajo wedding ceremony, some couples do not obtain marriage licenses because, traditionally, the performance of the ceremony completely validates the union. Unfortunately, Navajos without marriage licenses often face problems, such as difficulty in acquiring Social Security and military benefits for their dependents. *See, e.g.*, *Daw*, 1 Nav. R. at 1.

In 1954, the Navajo Tribal Council attempted to remedy this problem by allowing Navajo courts to validate Navajo custom marriages contracted on or before January 31, 1954. *Navajo Tribal Council Resolution* CF-2-54 (Feb. 11, 1954) (codified at 9 N.T.C. § 61, amended by *Navajo Tribal Council Resolution* CAP-36-80 (April 30, 1980)). The Tribal Council planned to begin "enlightening the Navajo people on the basic requirements for a valid legal marriage," probably with the hope that those marrying after January 31, 1954 would realize that they should obtain marriage licenses. *Id.* Yet even after 1954, many Navajos, adhering to the traditional belief that the performance of the traditional Navajo wedding ceremony fully validates the union, still did not obtain marriage licenses.

In 1969, the Court validated an unlicensed Navajo tribal custom marriage that occurred after 1954, observing that "[m]arriages in which the partners were recognized as being married prior to February 1, 1954 are clearly validated, but the Tribal Council did not outlaw specifically, common-law marriages after that date." *Daw*, 1 Nav. R. at 3. The marriage the Court in *Daw* validated was contracted by a traditional Navajo wedding ceremony, but lacked a license. A traditional Navajo marriage is not a common-law marriage, and unfortunately the Court in *Daw* mingled the two. *See* Black's Law Dictionary 251 (5th ed. 1979) . The Court apparently transformed the traditional Navajo marriage into a common-law marriage to circumvent the January 31, 1954 cut-off date so that the widowed spouse could receive veteran's benefits. The Court in *Daw* most likely did not intend to set precedent for validation of common-law marriages.

Although 9 N.T.C. § 5 provides that "[i]n order to contract a Tribal marriage ... [t]he couple must obtain a marriage license," the Court decided that the license requirement is directory rather than mandatory. *Daw*, 1 Nav. R. at 3. The Court in *Daw*, consequently, held valid an unlicensed Navajo traditional marriage. In addition, *Navajo Tribal Council Resolution* CJ-2-40 initially required couples who were married by a traditional Navajo wedding ceremony to obtain marriage licenses. However, a 1944 amendment to *Navajo Tribal Council Resolution* CJ-2-40 abolished the license requirement for weddings contracted according to

Navajo tradition. (Unnumbered Navajo Tribal Council Resolution, passed July 18, 1944). The amendment became 9 N.T.C. § 61 which reads:

> All purported marriages of members of the Navajo Tribe, not contracted by church, state or Tribal custom ceremony as defined by the resolutions of the Tribal Council, wherein such members were or are recognized as man and wife in their community, are validated and recognized as valid Tribal custom marriages from the date of their inception.

Although 9 N.T.C. § 61, on its face, seems to recognize common-law marriages, when read with 9 N.T.C. § 63 it does not. Section 63 states that "[t]he purpose of this section is to cure defects in ceremony and not to validate marriages which may be invalid for any reason other than defect in ceremony." That was exactly how section 61 was interpreted in *Daw*, 1 Nav. R. at 3. Such defects might have occurred, for example, when a couple performed a traditional Navajo wedding ceremony that failed to conform to the exact specifications that *Navajo Tribal Council Resolution* CJ-2-40 set forth.

Furthermore, in the same resolution in which section 61 originated, the Navajo Tribal Council mandated that "all future marriages of members of the Navajo Tribe ... must be solemnized by church, state, or tribal custom ceremony." *Navajo Tribal Council Resolution* (Unnumbered, passed July 18, 1944). Common-law marriage is not mentioned. By that resolution, the Navajo Tribal Council intended to recognize only marriages contracted by church, state or tribal custom ceremony, and not common law. *Id.* For that reason, section 61 cannot be read to recognize common-law marriage.

The statement in *Navajo Tribal Council Resolution* CAP-36-80 (April 30, 1980), that "[t]he Advisory Committee of the Navajo Tribal Council unanimously passed on March 13, 1980, a resolution recommending that the Navajo Tribal Council authorize the Courts of the Navajo Nation to validate Tribal custom marriages occurring after January 31, 1954," serves as further proof that the Navajo Tribal Council intended to allow for the validation of only unlicensed marriages contracted by Navajo traditional wedding ceremonies. *Navajo Tribal Council Resolution* CAP-36-80 directs that, to validate a traditional Navajo custom marriage, a court must receive proof that a traditional Navajo wedding ceremony occurred. In other words, Navajo courts can validate marriages in which traditional wedding ceremonies occurred, but not those in which no ceremonies occurred. Thus, although 9 N.T.C. § 61 includes the phrase "marriages ... not contracted by church, state or Tribal custom ceremony," it does not extend to common-law marriages.

A common-law marriage is invalid for reasons other than a defect in the ceremony because Title 9 states that Navajos can marry only in three ways: state, church, and tribal custom. 9 N.T.C. §§ 4(a)-4(b), 61. A common-law marriage is not recognized by Title 9.

After *Daw*, the Court decided that a couple must obtain a divorce certificate

to dissolve a traditional Navajo marriage. *In re Marriage of Slowman*, 1 Nav. R. 142, 143 (1977) (citing 9 N.T.C. § 257). In Slowman, the Court wrote that "[t]his situation is analogous to the requirement in states still recognizing common-law marriages that legal divorce be obtained to terminate such marriages." *Id.* Again as in *Daw*, 1 Nav. R. 1, the Court mingled traditional Navajo marriage with common-law marriage, although the Court did recognize that a valid traditional marriage existed between the deceased purported spouse and another party. *Slowman*, 1 Nav. R. at 143. This Court, however, does not read the above-quoted statement to imply that traditional Navajo marriages and common-law marriages are analogous.

A 1979 case says that "[d]espite the wording of the *Daw* opinion, this Court believes that the Navajo Tribal Council has directed the Courts of the Navajo Nation not to validate any custom marriages occurring after January 31, 1954." *In re Marriage of Ketchum*, 2 Nav. R. 102, 104 (1979). The Court in *Ketchum* held that "any marriage contracted by tribal custom after January 31, 1954 may not be validated by the tribal court but is recognized as a common law marriage." *Id.* at 105. In *Ketchum*, which added momentum to the effort to circumvent the January 31, 1954 cut-off date, the Court set forth the elements of a common-law marriage.

The next year, the Navajo Tribal Council abolished the January 31, 1954 cut-off date. *Navajo Tribal Council Resolution* CAP-36-80 (April 30, 1980). The Navajo Tribal Council decided to validate all Navajo tribal custom marriages, observing that "[t]he Navajo people have continued to marry in Tribal custom ceremonies since 1954," and "[t]he lack of validated marriages has created problems and hardships for numerous married Navajo people." *Id.* The Council "strongly urg[ed] the Navajo people to obtain a Navajo Tribal marriage license prior to any future marriages and to have such marriages recorded within three (3) months of their inception, in accordance with both Navajo Tribal and Federal laws." *Id.*

The January 31, 1954 cut-off date affected the outcome of *Ketchum*, 2 Nav. R. 102, which used the "common-law marriage" to validate a marriage that could not have been validated had it been termed a Navajo tribal custom marriage. The reason that the Court in *Ketchum* and *Daw*, 1 Nav. R. 1, used the term common-law marriage to describe Navajo tribal custom marriage no longer exists. Consequently, we now overrule the statement in *Ketchum* that "[t]his court does recognize the validity of common-law marriage." *Ketchum*, 2 Nav. R. at 104. Judicial recognition of common-law marriage is not necessary to protect those who participate in Navajo tribal custom marriages now that the cut-off date has been abolished.

In a criminal case, this Court found that the parties lacked a common-law marriage because their relationship did not meet the *Ketchum* criteria. *Navajo Nation v. Murphy*, 6 Nav. R. 10, 14-15. *Murphy* says that "[r]elationships commonly referred to as common-law marriages have been recognized as marriages within the Navajo Nation." *Id.* at 13 (citing *Ketchum*, 2 Nav. R. 102). *Murphy* relied on

*Ketchum* and likewise *Murphy* is overruled on that point where it recognizes common-law marriage.

In *Validating the Marriage of Garcia*, 5 Nav. R. 30 (1985), the Court held that 9 N.T.C. § 2 means that "a Navajo and non-Navajo may have a valid marriage under the laws of the Navajo Nation only if they comply with applicable state or foreign law." 5 Nav. R. at 31. The Court in *Garcia* declined to validate a Navajo traditional marriage between a Navajo and a Mexican-American. In this case the district court based its decision on *Garcia*.

This Court, however, does not rely on 9 N.T.C. § 2 or the *Garcia* interpretation of it, but instead on Navajo custom. The Navajo Tribal Council legislated this requirement: "In all cases the Courts of the Navajo Nation shall apply any laws of the United States that may be applicable and any laws or customs of the Navajo Nation not prohibited by applicable federal laws." 7 N.T.C. § 204(a) (1985). For this reason, and because domestic relations is at the core of Navajo sovereignty, this Court is obligated to apply Navajo custom. "Navajo customs and traditions have the force of law." *In re Estate of Belone*, 5 Nav. R. 161, 165 (1987).

Navajo custom does not recognize common-law marriages, regardless of whether one or both spouses are Navajos. *See* R. Locke, *The Book of the Navajo*, 20-23 (1976). Navajo tradition and custom do not recognize common-law marriage; therefore, this Court overrules all prior rulings that Navajo courts can validate unlicensed marriages in which no Navajo traditional ceremony occurred. For the same reason, this Court will not construe any section of Title 9 of the Navajo Tribal Code as authorizing judicial validation of common-law marriages. To enhance Navajo sovereignty, preserve Navajo marriage tradition, and protect those who adhere to it, Navajo courts will validate unlicensed Navajo traditional marriages between Navajos. For these reasons, the district court's refusal to validate the alleged common-law marriage between Chaca and Francisco is affirmed.

## III

As a sovereign Indian nation that is constantly developing, the Navajo Nation must be forever cautious about state or foreign law infringing on Navajo Nation sovereignty. The Navajo Nation must control and develop its own legal system because "the concept of justice has its source in the fabric of each individual society. The concept of justice, what it means for any group of people, cannot be separated from the total beliefs, ideas, and customs of that group of people." T. Tso, Chief Justice's Annual Report, Judicial Branch of the Navajo Nation Annual Rep. 1. (1988). Navajo life centers around the home, traditionally a hogan. *Id.* The Navajo Nation, within the four sacred mountains, is the Tribe's hogan and source of strength and wisdom. *Id.* Navajo "oral history contains no stories of leaders or assistance coming from outside." *Id.* Instead, Navajo tribal history reveals "that Navajos know best how to provide for Navajos." *Id.*

"Implicit in the Treaty of 1868 is the understanding that the internal affairs of the Navajo people are within the exclusive jurisdiction of the Navajo Nation government." *Billie v. Abbott*, 6 Nav. R. 66, 68-69 (1988) (citing *Williams v. Lee*, 358 U.S. 217, 221-22 (1959)). "The sovereignty retained by an Indian tribe includes 'the power of regulating [its] internal and social relations.'" *Id.* at 69 (quoting *United States v. Kagama*, 118 U.S. 375, 381-382 (1886)). "Navajo domestic relations is the core of the tribe's 'internal and social relations.'" *Id.* (quoting *Fisher v. District Court*, 424 U.S. 382 (1976)). Thus, "Navajo code law and Navajo common law regulate the domestic relations ... of Navajos living in Navajo Indian Country." *Id.* at 67.

By saying that "[m]arriages between Navajos and non-Navajos may be validly contracted only by the parties' complying with applicable state or foreign law," 9 N.T.C. § 2 allows outside law to govern domestic relations within Navajo jurisdiction. Such needless relinquishment of sovereignty hurts the Navajo Nation. The Navajo people have always governed their marriage practices, whether the marriage is mixed or not, and must continue to do so to preserve sovereignty. Regulation of marriages, an integral part of the Navajo Nation's right to govern its territory and protect its citizens, should be free from the reach of state and foreign law. The Navajo Nation must regulate all domestic relations within its jurisdiction if sovereignty has any meaning. Even the United States government found that local laws best govern domestic relations in most instances. *See, e.g., Hisquierdo v. Hisquierdo*, 439 U.S. 572, 581 (1979); *Ridgway v. Ridgway*, 454 U.S. 46, 54 (1981).

Enacted in 1957, 9 N.T.C. § 2 has outlived its usefulness. This Court recommends that the Navajo Tribal Council amend Title 9 of the Navajo Tribal Code so that it reflects Navajo regulation and control of domestic relations within Navajo territorial jurisdiction.

Affirmed.