OPINION[1]
This case is about ehild support and alimony between two people who have been apart for over two decades. Though the two individuals live separate lives and *365 current support arrangements have been made between them, litigation continues over arrearages incurred years ago.
I
The parties were married on May 26, 1964. After Appellee assisted in raising four children of his own and raising eight other children born to Appellant from a prior relationship, the parties were legally separated on October' 24, 1988. The parties had lived in a house obtained by the Appellee through the federal Navajo-Hopi Relocation Program (hereinafter the JUA House). The Separation Order of 1988 awarded the JUA home to the Appellant and Appellee was further ordered to pay $500 a month child support until the children graduated from high school (two of the parties’ children were 18 and 19 years old at the time[2]) and $800 a month spousal support (alimony). The Appellee did not pay both obligations for thirteen years, nor was any court proceeding initiated during this period to enforce the obligations.
On May 10, 2001 Appellant filed a petition for divorce and to have Appellee show cause for nonpayment of child support and alimony as initially ordered in the Separation Order. The children were 31 and 32 years old at the time. The Appellee filed a Response and a Counterclaim to reduce the monthly alimony. The trial court entered an Interlocutory Divorce Decree on December 05, 2001. The Final Decree of Divorce was then issued on September 08, 2003 which awarded arrearages on child support in the amount of $9,629.04 [3] and alimony in the amount of $126,606.48, but denied interest to the arrearages. The trial court further credited one-half of the value of the JUA home to the alimony arrearage. The trial court also denied the Appellant’s request to have the Appellee obtain a life insurance policy to cover the remaining arrearages. Additionally, the trial court reduced the alimony prospectively from $800 to $200 per month. Appellant appealed the trial court’s decision.
On March 2, 2005, the Court issued an opinion in Watson v. Watson, 8 Nav. R. 638, 6 Am. Tribal Law 644 (Nav.Sup.Ct. 2005) [hereinafter Watson I ], wherein it: (1) affirmed the award of arrearages; (2) reversed the family court’s denial of interest to child support arrearages; (3) held that a 10% compound interest rate be applied to alimony arrearages; and (4) reversed the family court’s decision to apply half of the value of the JUA home toward the spousal support arrearages. The Court further remanded the case instruct *366 ing the family court to enter findings of fact and conclusions of law to support its decisions in 1) denying Appellant’s request that Appellee obtain life insurance to cover the arrearages and 2) reducing the prospective spousal support. Watson /, 8 Nav. R. at 642, 6 Am. Tribal Law 644.
On remand, the family court conducted a status conference on September 20, 2005 and the parties agreed to the entry of a decision based on existing court records concerning the issues on life insurance and the decreased alimony; the records shows no hearing was ever held.[4] Thereafter, on May 10, 2007 the family court issued an order explaining its decisions as to the life insurance and decreased alimony payments. This order was followed by an amended Divorce Decree on August 07, 2007[5] again denying the request to have Appellee obtain life insurance and ordering that Appellee pay $200 a month alimony. The Divorce Decree also ordered that $800 of Appellee’s monthly wage be “assigned” to pay these obligations, with $200 per month for current alimony and $600 for both child support and alimony arrearag-es.[6] The trial court applied a 10% interest on both arrearages, as ordered by the Watson I Court, and specified that as of June 2007 Appellee owed $52,747.72 for child support arrearages and $412,216.17 for alimony arrearages. Once again, the Appellant appeals. The Appellee also continues to verbally challenge the court’s decision in the first appeal and the addition of interest but did not file a supporting brief.
A hearing was held on April 7, 2009 at Tuba City. An opinion was entered on December 14, 2009. A petition for reconsideration was subsequently filed by Appellant on January 4, 2010. This revised opinion follows.
II
The issues are 1) did the Tuba City Family Court abuse its discretion in denying Appellant’s request to have Appellee obtain a life insurance on his life to cover child support and spousal support arrear-ages; and 2) and did the Tuba City Family Court abuse its discretion when it reduced the spousal support prospectively from $800 to $200 per month?
III
We first establish the standard of review in this case. As a general principle, we will give considerable deference to the lower court’s exercise of discretion. Higdon v. Nelson, 7 Nav. R. 158, 159 (Nav.Sup.Ct.1995). The parameters of discretion are whether the court acted *367 within the rules, principles and customs applicable to the facts of the case. We will not overturn a discretionary decision unless the record shows that there was an actual abuse of discretion. Little v. Begay, 7 Nav. R. 353, 354, 1 Am. Tribal Law 521 (Nav.Sup.Ct.1998).
IV
For the stability of Navajo law, it is necessary to abide by, or adhere to, early judicial decisions. However, there are circumstances where we will find it necessary to reconsider and depart from previous holdings. We do so, however, with the utmost care.
A
To address the issues before the Court, a general discussion of the law as to child support and alimony is in order. On June 04, 1940 the Navajo Nation Council enacted a statute that mandates that a divorce must provide for a fair and just settlement of property rights and provide for the custody and proper care of minor children. 9 N.N.C. § 404. Through the implementation of this statute, it is now established law that it is the moral duty and legal obligation of a parent to provide and care for the minor children and the court’s duty is to ensure that the obligation is enforced. See e.g., Arviso v. Dahozy, 3 Nav. R. 84 (Nav.Ct.App.1982) (the courts are to ensure that children’s needs are met through child support payments); Tom v. Tom, 4 Nav. R. 12 (Nav.Ct.App.1983) (fathers owe the duty to support their children); Riggs v. Riggs, 6 Nav. R. 375 (Nav. Sup.Ct.1991) (9 NNC § 404 requires the family court to provide for the proper care of minor children); Notah v. Francis, 5 Nav. R. 147, 148-149 (Nav.Sup.Ct.1987) (it is a father’s “absolute obligation established by Navajo tradition to provide support for one’s children ... continuing for as long as the child[ren] needs the support ... or for the period indicated in the court order”); Alonzo v. Martine, 6 Nav. R. 395 (Nav.SupCt.1991) (when addressing child support issues, the primary person to be considered is the child, with the goal of providing that child adequate support); Nez v. Nez, 7 Nav. R. 25 (Nav.Sup.Ct.1992) (family court’s most significant duty is to provide for the best interest of the children). More specifically, the “courts require and fix child support payments to provide for the children’s needs, with adjustments based upon the assets, income, liabilities, and expenses of the parents.” Alonzo v. Martine, 6 Nav. R. at 396 (citing Descheenie v. Mariano, 6 Nav. R. 26, 27-29 (Nav.Ct.App.1988)). When the Child Support Enforcement Act (CSEA), 9 N.N.C. § 1701 et seq., was enacted in 1994, this Court was authorized to establish a scale of minimum child support contributions. On May 10, 1996 we adopted the Navajo Nation Child Support Guidelines and a formula was devised for minimum child support by taking into account the gross income of the parents and considering both parents’ contribution so that the support meets the basic needs of the child pursuant to 9 N.N.C. § 1706.[7] In the CSEA, Council explicitly addressed the Act’s exemption from the statute of limitations in Section 1714[8].
*368 While the CSEA provides for current or prospective support, it does not address how arrearages are to be handled. Prior to the CSEA in Notah v. Francis, 5 Nav. R. at 150-151, the court set parameters to the treatment of arrearages. The Court held that “payments must not be set at a level that would rain the party to pay, or cause extreme hardship to that party’s present family.” Id. at 151. Two years after the CSEA, Yazzie v. Yazzie, 7 Nav. R. 203 (Nav.Sup.Ct.1996), the seminal case assessing interest on child support arrear-ages was decided. For the first time, the Court began to elucidate the fundamental elements upon which arrearages would be analyzed. In Yazzie, the Court affirmed that trial courts have the discretion to set a “reasonable amount of interest” per Descheenie v. Mariano, 6 Nav. R. 26 (Nav. Sup.Ct. 1988). Id. at 205. The Court held that the authority to set a reasonable amount of interest on arrearages comes from the court’s power to enforce their judgments. Id. The Court characterized the imposition of interest as an incentive for the parent to pay on time, and that it was not done to penalize or punish. Id. at 206. Most importantly, for purposes of the present ease, Yazzie held that because our statutes are silent on arrearages, it will rely on a case from the state of Arizona to adopt the doctrine that “each installment of ... support is vested as it becomes due, ... constituting legal indebtedness for which the law allows the imposition of interest.... ” Id. at 205 (citing A.R.S. § 44-1201 in Jarvis v. Jarvis, 27 Ariz.App. 266, 553 P.2d 1251, 1253 (1976)).
This doctrine becomes the premise upon which the Court mandated a 10% compound interest on child support arrear-ages. What is especially significant of the Yazzie discussion is that it went beyond Jarvis to impose the 10% interest. Jarvis referred to and applied a state statute, A.R.S § 44-1201, which establishes a 10% interest for all obligations not otherwise set by agreement. The Navajo Nation does not have a similar statute; there is no statutory default interest rate in the Navajo Nation. There are simply too many variables and many factors in domestic cases to mandate a single rate by court order. This Court hereby holds that setting a default interest rate for arrearages is a role reserved to the legislature; it is lawmaking. The Navajo judiciary cannot, in effect, legislate such a default rate by mandating a single, specific rate for all cases. We therefore hold the Yazzie Court exceeded its authority by mandating the application of a 10% compound interest rate for all delinquent child support cases. We therefore reverse that portion of the Yazzie case that imposed the 10% compound interest rate on arrears of child support and affirm the trial court’s denial of interest on arrearages pursuant to its discretionary authority to set a “reasonable amount of interest” as specified in Descheenie v. Mariano, 6 Nav. R. 26 (Nav. Sup.Ct.1988).[9]
B
In contrast to child support law, we note that no statutory law on alimony has ever been enacted by our legislature. The development of alimony law has thus been from case law. Case law began in 1980 and from the very start our courts have *369 followed bilagaana. concepts when addressing alimony. For example, state statute was relied upon to declare that Navajo courts have authority to award alimony, see Johnson v. Johnson, 3 Nav. R. 9 (Nav.Sup.Ct.1980), and guidelines from state case law were applied to determine the nature and amount of alimony, see Charley v. Charley, 3 Nav. R. 30 (Nav.Ct.App.1980). The law applicable to civil actions at that time was as follows: “Any matter that are not covered by the traditional customs and usage of the Tribe, or by applicable Federal laws and regulations, shall be decided by the Court of the Navajo Tribe according to the laws of the state in which the matter in dispute may lie.” 7 N.T.C § 204(c) (enacted by CJA-1-59, January 6, 1959). The trial courts used this authorization to apply New Mexico statutory law's[10] and New Mexico case law, per Michelson v. Michelson, 86 N.M. 107, 520 P.2d 263 (1974). The New Mexico state statutes provided that a court could award alimony to the wife by using the husband’s separate property and further allowed the wife to have full title to such property. Using the Michelson case as a guide, the Court in Charley held that alimony must be decided on a case-by-case basis under the fair and reasonable standard and that trial courts are to consider:
(1) the needs of the wife,
(2) her age,
(3) means to support herself,
(4) the earning capacity and the future earnings of both parties,
(5) the duration of the marriage and
(6)the amount of property (with values) owned by the parties.
Sells, 5 Nav. R. at 104 (further clarifying Charley’s guidelines). It is noteworthy that the Charley Court pointed out that state laws from where the spouse and children reside will determine the standard for alimony until the legislature or this Court sets other standard. Charley, 3 Nav. R. at 31. The Court in Charley clearly expected the Navajo Nation would eventually adopt its own standards. Only one statute enacted since Charley impacts alimony. In 1985 the legislature adopted the 1985 Judicial Reform Act abolishing the requirement for application of state laws. Subsequently, the Court in Sells v. Sells, 5 Nav. R. 104, 107-108 (Nav.Sup.Ct.1986) overruled Charley’s application of state law's when determining the standard for alimony. Cha,Hey was reversed for two reasons: 1) state laws do not control domestic relations within our jurisdiction as expressed in Williams v. Lee, 358 U.S. 217, 79 S.Ct. 269, 3 L.Ed.2d 251 (1959), and 2) the passage of the 1985 Judicial Reform Act removed the requirement of applying state law7 and allowed the Navajo courts to apply Navajo law7, custom, and tradition when appropriate.[11]
The Sells Court established further guidelines for alimony in addition to those established in Charley and these include but are not limited to:
1) reasonable market value of marital property apportioned to the spouse seeking alimony and the ability of *370 such spouse to meet his or her needs independently;
2) economic circumstances of each party, including health, work station or social position, vocational skills or need for retraining or to acquire new skills, employability, and opportunities to acquire capital assets;
3) liabilities of the parties;
4) the contribution of a spouse as a homemaker or the contribution of each spouse to the family;
5) who will have the children and their needs;
6) consideration of Navajo traditional and customary Navajo law, where applicable and;
7) all other relevant facts.
Sells at 106. In addition to the use of guidelines enumerated above, it is important to note that the award of alimony is usually limited in the decree by death, remarriage or until further order of the court. The Sells Court explained that whether the court labels alimony as permanent or indefinite the award is always subject to modification upon changed circumstances—alimony can be stopped altogether. The Court explained that because the future is uncertain, no one knows the exact date on which alimony will no longer be needed. Id. at 108, 520 P.2d 263.
Alimony arrearage was finally directly addressed in another Yazzie case, Yazzie v. Yazzie, 7 Nav. R. 33 (Nav.Sup.Ct.1992). In that Yazzie, the trial court dissolved a marriage of thirty-six years and ordered the ex-husband to pay alimony of $50.00 per month to his ex-wife. Mr. Yazzie never made any payments. The trial court found Mr. Yazzie in contempt of court, fined him $100 and awarded Ms. Yazzie reduced alimony arrearages and terminated future alimony payments. Ms. Yazzie appealed the amount of arrearages awarded and the terminated alimony. On appeal, this Court held that alimony payments, as they become due, become vested. In other words, the receiving spouse is immediately entitled to the payment as it becomes due. The Court further held that alimony cannot be modified without a petition nor can it be retroactively modified without providing notice and an opportunity to be heard by the receiving spouse. Id. at 34. As a result, this Court reversed the trial court’s award of the reduced arrearages and the termination of the alimony payments; Mr. Yaz-zie was ordered to pay the full amount of the arrearages and to continue his monthly alimony payments.
Most recently in the Watson I, the Court extended the mandatory 10% compound interest rate to alimony arrearages without elaboration (noting only that child support and alimony were analogous) as to why a single interest rate must be applied to alimony arrearages. As will be explained, infra, there are substantive differences in the values and concepts behind child support and alimony. Watson / fails to elaborate on the differences and the simple analogy is insufficient to justify the expansion of a mandatory interest rate for child support arrearages to alimony ar-rearages. We therefore reverse Watson I in the imposition of a 10% compound interest rate on arrears of alimony and affirm the trial court’s denial of interest on alimony arrearages.[12]
*371 V
Now we come to the present lawsuit where this Court must first address both child support and alimony ar-rearages. With regard to child support, the Court is troubled that the Appellant is asking for enforcement of a judgment thirteen years after its entry and after her children turned 31 and 32 years old. This Court has long held that, “... the parent receiving the payment should not delay in seeking enforcement ... undue delay not only imposes a hardship on the child, it also causes the arrearages to pile up to the point where the delinquent parent might not be able to pay it off.” Notah v. Francis, 5 Nav. R. at 151. Moreover, a custodial parent seeking the enforcement of a court ordered support amount “should initiate a lawsuit as soon as possible to avoid large arrearages.” Descheenie, 6 Nav. R. at 30. With the passage of the CSEA, the Navajo Nation Council stated that “[n]o statute of limitations shall be effective to prevent the establishment, modification, and/or enforcement of parentage and/or child support for any child from birth until the child readies the age of 18.” 9 N.N.C. § 1714 (emphasis added).[13] Thus, the CSEA tolls the statute of limitations (prevents it from applying) for establishment, modification and/or enforcement of parentage and/or child support actions from the child’s birth until the child turns 18. It can therefore be deduced that enforcement can be barred by the statute of limitations after the child turns 18.[14]
In the case before us, the interest on child support arrearages constitutes a large portion of the $52,747.72 owed as of June 1, 2007. The large amount accumulated in part because Appellant waited 13 years to enforce her judgment. The wait has since created hardship on the Appellee, who unfortunately continues (to this day) to pay child support arrearages through a court-ordered wage assignment. Yet, it is obvious from the request to order a life insurance policy that it is highly unlikely that the Appellee will ever have the means during his lifetime to pay all of the arrearages, especially with the imposition of the compounding interest rate of 10%. In 2003, the trial court therefore erred in its enforcement of child support arrearages 13 years after entry of judgment for children who have since turned 31 and 32; this is contrary to the clear language of Section 1714 of the CSEA resulting in an unjust decision. In her reconsideration arguments, Appellant argues that the “law of the case” doctrine should apply and that arrearages awarded in Watson 1 should be undisturbed. The law of the case doctrine is one of procedure, not jurisdiction, and we will not apply it where its application will result in an unjust decision. Other jurisdictions that apply this doctrine do not apply it with uniformity. Subsequent changes or an error in the first ruling will dictate against strict application of the doctrine that the same courts shall not change *372 prior rulings in the same case involving the same parties. Even horizontal case law cited by Appellant clearly states that its merely discouraged—not mandatory. There are circumstances where the trial court may have to change prior rulings. We hold that the Supreme Court can always review prior decisions made in the same case involving the same parties. We therefore reject the Appellant’s argument that this Court has no jurisdiction to review prior decisions and/or raise matter not raised by the parties. We therefore reverse the trial court’s enforcement of child support arrearages and reverse Waf-son’s I’s affirmation of those arrearages and its order to the trial court to impose a 10% interest.
Aside from the statute of limitations, we consider the doctrine of laches. Rule 8(c)(2)(G) of the Navajo Rules of Civil Procedure lists laches as an affirmative defense. The rule provides that if an affirmative defense is “not pleaded at the time the answer is filed, [it ] may be asserted thereafter only by leave of court upon written motion to amend the pleadings.” The record does not show laches was asserted as a defense 21 years ago, nor does the record show that Appellee has ever motioned the court for leave to amend his pleadings. Nevertheless, the Court, upon its own motion, will consider whether lach-es is applicable to Appellant’s claims because the Family Court, as a reason for its decision, pointed out how the Appellant’s inaction and passage of time created the “dilemma” now facing the Court. Order, Watson v. Watson, No. TC-FC-348-2001 (T.C. Dist.Ct. May 10, 2007). Accordingly, this Court needs to consider the doctrine of laches.
In Notah, we held that enforcement of child support cannot be barred by statute of limitations, the doctrine of laches, and the mother’s previous failure to act to enforce the obligation of a parent to provide support of one’s child, Notah, 5 Nav. R. 147, 149 (emphasis added). The holding of Notah pertained to support of a child (not an adult) resting on the absolute obligation of a parent to provide support “as long as the child needs that support.” Id. at 148. “Since Notah, Council, in its enactment of the CSEA, explicitly defined from birth until the child, turns 18 as the period when establishment, modification, and enforcement of child support is barred by the statute of limitations.” 9 N.N.C. § 1714 (emphasis added). After the age of 18, it is clear that defense of statute of limitations applies. Similarly, the defense of laches and one’s failure to act to enforce child support obligations also apply. To that extent, that portion of Notah that barred the strict application of such defenses had been overruled.[15] In this appeal, enforcement of a child support order, granted to children 18 and 19 years of age at its entry, is being sought 13 years later and after the children have since turned 31 and 32. Under these circumstances, the doctrine of laches will bar enforcement.
With regard to alimony, the doctrine of laches is also before the Court because the Court in Yazzie v. Yazzie, 7 Nav. R. 33, did not consider Rule 8(c)(2)(G) when it made a rather strict holding that “a court may not act on its own to amend, modify, or terminate a decree for alimony payments.” Id, at 34. Yet, the same *373 Court in announcing that a petition must first be filed by a party stated that a court “has great discretion to determine whether to make changes.” Id. at 34. The Yazzie Court also held that “a payor spouse, on notice, may not simply refuse to pay, wait out the order to comply and later assert laches to bar the claim of the payee spouse.” Id. at 35. This Court notes that unlike the ex-husband in Yazzie, the Ap-pellee here filed a response and counterclaim and specifically requested for modification of alimony. We can then say that a request was made by the Appellee which was communicated to Appellant, Furthermore, the Appellee made efforts to provide support.
As traditional law dictates, Appellee left the home at Appellant’s request with only his clothes, tools and a three-year old Dodge pick-up truck. Appellee left for Appellant and the children: a JUA home, home furnishings, two pick-up trucks, and all other property accumulated during the marriage. By his own agreement, he later made arrangements for Appellant to receive one-half of his Peabody Coal retirement benefits. Customary law directs the man to leave with his personal possessions (which includes his horse, riding gear, clothes, and religious items) and the rest of the marital property stays with the wife and children at their residence for their support and maintenance. Whatever gains the marital property generates goes to the support of the wife and children and to a lesser extent the wife’s closest relatives. This longstanding customary law is akin to modern spousal maintenance. Naize v. Naize, 7 Nav. R. 269 (Nav. Sup. Ct 1997). Taking into consideration the elderly age of the parties and their traditional lifestyles, we find Appellee, in accordance with custom, provided support akin to spousal maintenance.
It therefore cannot be said that the Ap-pellee totally refused to pay spousal maintenance. It cannot be implied that the Appellee was not doing anything and not making any effort to meet his obligation. One has to look at the facts between Yaz-zie and this case in order to state whether or not laches applies. In this instance, because the Appellee was not going to simply wait it out, the principle of laches can be applied. It can be applied because Yazzie did not consider the application of the tradition law and principles that we now thoroughly consider. The Court further notes that it would not be appropriate to remand this issue back to the Family Court. Simply because too much time has been expended on this litigation, payments are being made and the parties are now in their senior years, the Court will make its decision now.
It should be beyond dispute that a 13-year delay is unreasonable. The record does not show any justification for the delay. When the delay in enforcement is substantial, it is reasonable to presume that each party has resumed their lives as a single person and the recipient of alimony is not totally dependent on the payments. The traditional teaching that each of us is responsible to do what is necessary to make or provide a decent life—T’áá kwó ají t'éego—means that we can not simply sit on our rights; at some point in time our inaction with the resultant delay will be deemed negligence and the asserted right will not be enforced by the courts. Responsibility goes both wrays—both the obligation to pay and the obligation to timely enforce your rights is imperative. It is especially important that in this case where the children now are all adults.
The Appellant’s argument for enforcement appears to be based upon the notion that court judgments can always be enforced, i.e., money judgments are abso *374 lute debts. This argument is based on concepts expressed in Yazzie v. Yazzie, 7 Nav. R. at 33, that child support and alimony payments become vested at the time of the court order; that support judgments cannot be modified except by petition; and cannot be retroactively modified. But as this Court has noted herein, child support and alimony are always subject to modification upon changed circumstances. To the extent that Watson / relied upon Yaz-zie for these concepts, this Court hereby clarifies that those statements do not mean that the equitable defense of laches cannot be applied in appropriate cases. The Court hereby holds that the Appellant’s entire claim for arrearages in both child support and alimony is also barred by the equitable defense of laches.
VI
This Court will now consider the family court’s denial of Appellant’s request to have Appellee obtain life insurance to cover the arrearages. It could be argued that with the Court’s reversal of Watson I (as to the award of arrearages and imposition of interest) and the application of the statute of limitation and the doctrine of laches, the issue concerning the remedy of life insurance is moot. Because this issue is likely to rise again in other cases, the Court will address the issue and provide future guidance.[16] The request to secure a life insurance is a bilagaana way of making arrangement for payment of indebtedness. The use of life insurance as a remedy is foreign to our Diñé way of life. As both parties are elderly, they were likely raised traditionally, were taught Dine values and concepts, and thus would understand and live by the Dine values and concepts. To the Appellee, it would be uncouth and especially vulgar to demand that he secure a life insurance policy against his will so that the insured amount would be used to pay the arrearages upon his death. According to the Family Court, Appellant should not be given an incentive to wish for an early demise of Appellee. We agree. To demand such a remedy in the Diñé perspective is Diñé biz nidizin, the notion of wishing ill-will or early death on an individual. The negative implication is adverse to the Dine way of thinking of living a long healthy life into old age. It is quite different if a person voluntarily obtains a life insurance which is then deemed to be a personal choice of the individual.
During the oral argument, the legal counsel for Appellee used a Navajo term, Yówéé’ át’áo, (it’s unbelievable) to describe Appellee’s circumstances. Despite Appel-lee’s arrangements to leave the home with just his personal belongings, his arrangement to share his retirement benefits with Ms. Watson, and his current monthly payments of $800 per month, the Appellant now anticipates his demise so that arrear-ages can be paid. Establishing precedent for such a remedy would have a profound impact on the Diñé because it is offensive to the values and custom of the Diñé and this Court will not create such a remedy. Therefore, this Court finds no abuse of discretion of the trial court’s denial of life insurance in its May 27th Order and the denial is affirmed.
VII
We have held that the application of laches bars enforcement of alimony under these circumstances, now we consider whether the trial court abused its discretion in decreasing the amount of alimony *375 because Appellee, by his own agreement, agreed to provide Appellant spousal support in the court-ordered amount of $200 per month (since August 8, 2002). This Court has noted the initial reliance by our courts on foreign bilagaana concepts and principles and that the development of law in this area did not sufficiently take in account Diñé values and principles. The foregoing discussion is therefore needed to specify some of the Dine values and principles underlying support of a former spouse.
A
Our elders have always taught the concept of T’áá hwó ají t’éego (self-reliance). The emphasis of this value is that one must prepare himselfyherself for the difficulties in life-one needs to rise early to meet the dawn and be blessed with the desire, commitment and capabilities necessary for a strong positive mental attitude, physical strength and endurance and capabilities in dealing with life’s challenges. Elders often say, Yáá da bí k’izhgóó nidez k’qqn, meaning that one must be aware that he/she will encounter unexpected challenges throughout life and in the face of adversities, he/she must be resilient. These values apply to all; particularly, to a woman who marries and becomes a parent. Should the marriage end, the mother remains responsible for maintaining the home and raising the children despite the difficulties she may encounter. “Traditionally, the responsibility for a family whose male spouse either has deserted or is deceased falls upon the family of the female.” Johnson v. Johnson, supra at 11. The mother must remain because she is the keeper of life and home. This crucial role is traditional law—Yoolgai Asdzáán Bi Beehazáanii. The principles of this law: (1) lina Yésdáhi, (2) Yódí Yésdáhi, (3) N’tliz Yésdáhi, and (4) Tsodizin Yésd-áhi have been explained by this Court. See Riggs v. Estate of Attakai, No. SC-CV-39-04, 7 Am. Tribal Law 534 (Nav.Sup.Ct.2007). The mother’s responsibility, of course, is distinguished from the father’s role. Navajo customary law dictates that
D. It is the right and freedom of the people that the sacred bonding in marriage and the unity of each family be protected; and
E. It is the right and freedom of the people that every child and every elder be respected, honored, and protected with a healthy physical and mental environment, free from all abuse
1 N.N.C. § 204(D)(E). The role of the mother and father must complement each other so that what was acquired through the joint labor is for the support, benefit, and safety of the children. See Naize v. Naize, 7 Nav. R. at 271 (Nav.Sup.Ct.1997).
B
Before a decision can be made as to the amount of alimony, we must grapple with wiiether alimony can be permanent or is it essentially a concept of providing support until such time as the ex-spouse is able to provide for herself or himself? In Naize v. Naize, 7 Nav. R. 269, the Court reviewed an order requiring the ex-husband to provide wood and coal for an indefinite time period. The Court, in conformance with the concept of finality in Navajo law, held that once there is a divorce, harmony in the community and in the parties’ lives should be restored as quickly as possible. The Court thus reversed the requirement of providing wood and coal for an indefinite period.
Navajo traditional law teaches the principle that once a couple divorce, each must live their separate lives. Id. at 273 (citing Apache v. Republic Nat'l Life Insurance Co., 3 Nav. R. 520 (W.R.Dist.Ct. *376 1982)). To require a former spouse to keep ties (apart from child support) is strongly discouraged. Id. Therefore, the practice of “permanent” periodic payment of alimony is foreign and at odds with our traditional teachings. Rather than the parties completely breaking free of each other and living one’s own life, it perpetuates continued contact. To continue alimony for an indefinite period is like having a law that treats a paying spouse as not being divorced. The courts are therefore cautioned against indefinite alimony.
In this appeal, we have to look at the matter comprehensively as to what is fair and consistent with Dine justice. The exercise of discretion by the family court was not easy (it rarely is) when adjudicating human relationships. The Court holds that the family court considered the factors discussed herein and finds no abuse of discretion in decreasing alimony from $800 per month to $200 per month prospectively. Therefore, the family court decision as to the reduction is affirmed. Appellee, by his own agreement, is obligated to continue alimony payments.
C
This Court now has to address the dispute about credit for the house raised at the initiation of this litigation. For the same reason that we addressed the matter of life insurance even though it may be moot, the Court will consider this issue also—the credit of the value of property toward arrearages will likely rise again. In Watson I this Court opined that the trial court could not credit one-half of the value of the JUA Home toward alimony arrearages. The reason for not allowing the credit was due to the rationale that it was part of the property distribution and therefore should not be considered toward the arrearages. In contrast, and in a similar situation, the Court held that “in-kind contributions may be cx*edited to child support payments when allowed by the court or when both parties consent to the substitution.” Notah v. Francis, 5 Nav. R. at 150. This Court, as illustrated by the teaching described above of having the ex-husband leave the marital property for the family, holds that property distribution is an essential component of alimony. This Court therefore reverses Watson I in not crediting one-half of the value of the home toward alimony arrearages and affirms the trial court’s decision in giving credit of the JUA home toward the arrearages.
VIII
Based on the foregoing, the Court holds that the Appellant’s claim for and the award of child support arrearages is BARRED by statute of limitations and the equitable defense of laches. Appellant’s claim for and the award of alimony arrear-ages is also BARRED by the equitable defense of laches. The Court AFFIRMS the decision of the Family Court to deny Appellant’s request that Appellee obtain life insurance to cover child support and alimony arrearages. The Family Court’s decision to reduce spousal maintenance from $800 to $200 is also AFFIRMED. We also AFFIRM the Family Court’s decision to credit one-half the value of the home toward child support and alimony arrearages. We OVERRULE that portion of Yazzie, 7 Nav. R. 203 (Nav.Sup.Ct. 1996), that imposed a 10% interest rate for child support arrearages and that portion of Notah that strictly barred statute of limitations and equitable defenses to enforcement of child support. Further, we OVERRULE that portion of Watson I that imposed a 10% interest rate for alimony arrearages. The Appellee is reminded that per his own agreement, he is obligated and is hereby ORDERED to continue alimony payments in the amount of *377 $200.00. The Family Court is instructed to issue a modified divorce decree consistent with this opinion.

. This opinion, originally decided on December 14, 2009, was amended upon our granting of Appellant's petition for reconsideration. The substantive decision of the December 14, 2009 remains as is, but the reader will note two types of changes that have been made in this opinion. First, we have made certain changes to clarify what appears to have been confusing. These are generally grammar and formatting changes. Second, we made changes where the Court considers and responds to arguments raised in the motion for reconsideration. This opinion supersedes our prior decision in all respects.

. In our initial decision, we stated that the parties' children were still minors. However, in reviewing Appellant's arguments on reconsideration that "child support arrearages have been entered only for the period of time that the children were under the age of eighteen,” Appellant’s Recons. Br. at 11, we found that the children were actually 18 and 19 at the time the trial court first ordered child support. We therefore disagree with Appellant’s argument on reconsideration that child support was granted for minor children and that Appellee failed to provide support during their minority. Appellant sought and was granted child support in 1988 for J.W., D.O.B.: May 1, 1969, and D.W., D.O.B.: May 4, 1970, until they graduated from high school. The Court expresses no opinion as to the circumstances wherein child support can be granted beyond a child’s 18th birthday.

. Based on the review' of the lower court record, we disagree with the amount of child support arrearages. The trial court calculated child support arrearages at $9,629.04 without interest as of May 1, 1990, the date child support supposedly ceased. Support ($250 per month per child) did not cease for both children at the same time, it ceased upon their graduation, which differed. J.W. graduated in 1990 (at 21 yrs. old) and D.W. graduated in 1989 (at 19 yrs old). Child support arrearages for J.W. should have been about $4750 (250 x 19 mos.) and $1750 (250 x 7 mos.) for D.W.; about $6,500 total.

. The record of this extended litigation shows that at every occasion where the parties were in court together, the immediate proceeding was concluded with an agreement by the Ap-pellee to pay the Appellant which was then incorporated into an order. There never has actually been a trial on the merits.

. The Court notes there was a two year delay between the Watson I decision and the amended Divorce Decree, and the Family Court apologized for its delayed ruling. The delay contributed to the large assessment of interest now owed by Appellee. Whether or not interest should be applied for the period a matter has been submitted to the court and the time that it takes to render a decision is an interesting policy matter, but we do not make a comment on it at this time.

.Is this assignment actually garnishment of Appellee’s wages? If Appellee's agreement is incorporated into the order and deemed an assignment, the effect of the order is the same as a garnishment—a third party (the employer) is ordered to directly pay the ex-wife. The Navajo Nation authorizes garnishment of wages only for child support (see 9 N.N.C § 1712(B)); thus, there is an issue whether Appellee’s wages could be assigned for alimony and alimony arrearages. This issue was not raised and the Court will not address it.

. The Judiciary Committee of the Navajo Nation Council approved the guidelines on July 25.1996 by Resolution No. JCJY-9-96 and the guidelines became effective immediately.

. The parties did not consider Section 1714 in their arguments, but it is obviously relevant. Section 1714 states as follows "No support lien, wage assignment, or garnishment shall be deemed invalid or nonactionable due to the expiration of the statute of limitations on any action for failure to provide child support or maintenance for any child(ren). No statute of limitations shall be effective to prevent the establishment, modification, and/or en- *368 forcernent of parentage and/or child support for any child from birth until the child reaches the age of 18.”

. The consequences of our holding is that Navajo courts have discretion to set a reasonable amount of interest on child support ar-rearages. Navajo courts will no longer be mandated to apply a 10% compound interest rate.

. Section 40-4-3, NMSA (1978), Section 22-7-6, N.M.S.A.1953 Comp, and Section 22-7-13, N.M.S.A.1953 Comp, (as applicable herein prior to the 1973 Amendment)

. In this instance case, the parties do not challenge the authority of Navajo courts to award alimony. Nonetheless, it is necessary to clarify law as to jurisdiction. The authority of Navajo courts to award alimony is not totally dependent on the interpretation of the 1985 Judicial Reform Act because the discretionary language of the Act (the use of the word “may”) and Diñé traditional law requires some spousal maintenance upon divorce. See Naize v. Naize, 7 Nav. R. 269, 270-272 (Nav.Sup.Ct.1997). Jurisdiction is not therefore dependent on the Act.

. The consequences of our holding and reversal of Watson I is that Navajo courts have discretion to set a reasonable amount of interest on alimony arrearages, similar to the discretion of Navajo courts to set a reasonable amount of interest on child support arrearag-es. See supra note 10. Navajo courts will no longer be mandated to apply a 10% compound interest rate on alimony arrearages.

. We addressed the CSEA in our prior opinion without much emphasis on 9 N.N.C. § 17¡4. The Appellant's legal counsel did not mention its relevance in their pleadings at all, yet he argues on reconsideration that the law at the time of Watson I should apply. We therefore address this provision

. There is a statute for writs of execution, 7 N.N.C. § 705, that has never been mentioned by the parties. The statute provides that a party in whose favor a money judgment is given may have a writ of execution issued for its enforcement. However, a writ cannot be issued after the death of debtor, except for payment of child support. Although this particular statute does not apply in this appeal because no writ of execution was requested, we acknowledge a child support debt may survive one's death in an action for writ of execution.

. In Appellant's reconsideration, she argues that the law of the Navajo Nation has been for many years that child support arrearages are not subject to defenses of statute of limitations, the doctrine of laches, or a parents inaction according to Notah v. Francis, 5 Nav. R. 147 (Nav. Sup.Ct. 1987). Appellant however fails to mention the CSEA and its relevance since Notah. We therefore address Notah in light of the 1994 CSEA.

. See In re Termination of Yazzie and Bartney, No. SC-CV-37-05, 7 Am. Tribal Law 539, 540 n. 2 (Nav. Sup.Ct.2007) for a recent case where this Court addressed a moot issue for similar reasons.